IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORRAINE CORDERO, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-cv-01868-RAL |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of Social | : | |
| Security | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

RICHARD A. LLORET                                   March 31, 2022
U.S. MAGISTRATE JUDGE

## I.    INTRODUCTION

An Administrative Law Judge ("ALJ") denied Lorraine Cordero Social Security benefits, after a district court remanded an earlier decision by a separate ALJ because of errors. Ms. Cordero contends that the latest unfavorable decision was also reached in error. Doc. No. 16 ("Pl. Br.") at 2. Ms. Cordero argues that the ALJ: (1) Failed to properly weigh the medical opinion evidence in a number of ways, and (2) failed to properly evaluate Ms. Cordero's subjective testimony. *Id.* at 4–33. The Acting Commissioner of Social Security ("Commissioner") responds that because the ALJ's decision is "[u]ltimately . . . supported by more than a scintilla of evidence (the low threshold required by the 'substantial evidence' standard of review) (citation omitted) the Court should affirm the ALJ's decision." Doc. No. 20 ("Def. Br.") at 2.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as Defendant. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On January 10, 2022, I ordered supplemental briefing on the issue of whether, if the ALJ accepted the opinion of Ms. Cordero's treating neurologist, it would have supported a granting of disability benefits due to her epilepsy. Doc. No. 23. The parties both supplied supplemental briefing on January 18, 2022. Doc. Nos. 24 and 25. Ms. Cordero argues that acceptance of Dr. Lim's opinion with regard to her epilepsy diagnosis would support a finding of disability under the Listings. The Acting Commissioner argues that acceptance of Dr. Lim's opinion would not support a finding of disability under Listing 11.02A or 11.02D because the ALJ pointed to places in the record where Ms. Cordero failed to properly take her epilepsy medication, proving she was not adhering to prescribed treatment. Doc. No. 25 at 2-3.

After careful review, I find that the ALJ's decision was not supported by substantial evidence. The ALJ improperly rejected the four treating specialists' opinions, all of which supported a disability finding. These failures were exacerbated by the ALJ's improper handling of Ms. Cordero's lay testimony, including that submitted by her mother. As a result of the ALJ's errors, he improperly found Ms. Cordero not disabled. Because the record is complete and supports a finding of disability, and remand would serve no purpose, I will grant the Plaintiff's request for review and enter an order directing the payment of benefits.

II.    **PROCEDURAL HISTORY**

Ms. Cordero filed a claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") on July 3, 2012.[2] Administrative Record ("R.") 142, 157, 321-34. She originally alleged a disability onset date of October 2, 2008. *Id*.[3] Her application was initially denied in February 2013 and she requested a hearing before an ALJ. R. 187-88. ALJ Craig De Bernardis held a hearing in March 2014, R. 66-71, and a supplemental hearing on June 16, 2014, during which the Plaintiff and a medical expert, Luka Cohen, Ph.D., testified. R. 40-65. ALJ De Bernardis found Ms. Cordero was not disabled in a July 2014 opinion. R. 20-39. Plaintiff requested review of the ALJ's decision to the Appeals Council the following month. R. 19. The Appeals Council denied the request for review in January of 2016. R. 1-9.

Following the Appeals Council denial, Ms. Cordero appealed to the Eastern District of Pennsylvania. Accepting and adopting the report and recommendation of Magistrate Judge Henry Perkin, United States District Judge Berle Schiller granted Ms. Cordero's request for review. R. 941. Judge Perkin's report and recommendation to Judge Schiller found that the ALJ (1) failed to examine the factors found in 20 CFR § 416.927(c)(1-6) in order to decide the appropriate weight to be given to the treating source's opinion, after the ALJ decided not to give that opinion controlling weight, R. 957; and (2) failed to evaluate or indeed mention the statement made by Ms. Cordero's

---

[2] The procedure by which the Social Security Administration evaluated medical opinions changed on March 27, 2017. Ms. Cordero's claim is reviewed using the regulations in place prior to March 27, 2017. *See* 20 C.F.R. § 416.927, Evaluating opinion evidence for claims filed before March 27, 2017.

[3] Ms. Cordero amended her disability onset date to April 5, 2010, before her second hearing, on April 11, 2019. R. 1081. Ms. Cordero was 30 years old on the alleged disability date. R. 1060. Born in March 1980, she is now 41 years old.

mother. R. 958-60. These errors in the ALJ's decision made meaningful review by the Magistrate Judge impossible and required a remand to the Commissioner. R. 961.

Upon remand, a new ALJ was assigned, and another hearing was held, where Ms. Cordero and a vocational expert testified. R. 852–911. Following the hearing, the new ALJ issued another unfavorable opinion dated July 5, 2019. R. 817-42. Ms. Cordero's attorney filed a detailed letter objecting to the opinion on August 30, 2019. R. 1060-65. By notice dated February 12, 2020, nearly eight years after Ms. Cordero filed her claim, the Appeals Council determined it would not assume jurisdiction of the case.[4] R. 801-07. This appeal follows.[5]

## III.  FACTS

Ms. Cordero has a complicated and lengthy medical history. She has been treated for a number of years by two neurologists for epileptic seizures and chronic migraine headaches. She has also been treated by two board-certified psychiatrists for bipolar disorder, depression, and anxiety. Her medical records, which include, along with treatment records, a number of medical opinions by all her treating doctors as well as a number of consulting doctors, span over two thousand pages.[6] All four of Ms. Cordero's treating specialists provided opinions that support a finding of disability.

### A. Claimant's Background

---

[4] In cases where, as here, an ALJ makes a decision after remand from the federal district court, the decision is considered final (and thus again appealable to federal court) when no exceptions are filed and the Appeals Council does not assume jurisdiction. *See* 20 C.F.R. § 404.984.

[5] The matter was assigned back to Magistrate Judge Henry Perkin after Ms. Cordero took her second appeal to the district court, and Ms. Cordero consented to having the case heard directly by the Magistrate Judge. Doc. No. 11. On October 27, 2021, the case was reassigned to me, as Judge Perkin has retired. Doc. No. 22.

[6] Where necessary, I will discuss details of those medical records within my discussion of the legal issues.

Ms. Cordero was 34 years old on the date she was last insured—June 30, 2014. She did not graduate from high school, but received her GED and went on to complete two years of college. R. 321, 358, 373. The Commissioner has agreed that Ms. Cordero has no past relevant work. R. 840.[7] Ms. Cordero claims, and the Commissioner agrees, that she has a total of seven severe impairments. R. 820.

## B. The ALJ's Decision

In reaching his decision, the second ALJ to review this case made the following findings of fact and conclusions of law pursuant to Social Security's five-step sequential evaluation.[8]

At step one, the ALJ concluded that Ms. Cordero has not engaged in substantial gainful activity since her alleged onset date of April 5, 2010. R. 820. At step two, the ALJ determined that Ms. Cordero had seven severe impairments: 1) bipolar disorder, 2) depressive disorder, 3) generalized anxiety disorder, 4) mood disorder, 5) seizure disorder, 6) migraines/headaches, and 7) degenerative disc disease.[9] R. 820. The ALJ also found a number of non-severe impairments, including iron deficiency anemia, renal calculus and mastitis, not resulting in any significant work-related functional limitations

---

[7] Past relevant work is defined by the Social Security Administration as work done within the past 15 years, that qualifies as "substantial gainful activity," and that lasted long enough for the claimant to have learned to do it. 20 C.F.R. § 404.1560(b)(1) and 416.960(b)(1).

[8] An ALJ evaluates each case using a sequential process until a finding of "disabled" or "not disabled" is reached. The sequence requires an ALJ to assess whether a claimant: (1) is engaging in substantial gainful activity; (2) has a severe "medically determinable" physical or mental impairment or combination of impairments; (3) has an impairment or combination of impairments that meet or equal the criteria listed in the Social Security Regulations and mandate a finding of disability; (4) has the residual functional capacity to perform the requirements of his or her past relevant work, if any; and (5) is able to perform any other work in the national economy, taking into consideration his or her residual functional capacity, age, education, and work experience. See 20 C.F.R. § 416.920(a)(4)(i)–(v).

[9] Only the ALJ's handling of degenerative disc disease is not at issue here.

(R. 828); mild neurocognitive disorder (*id.*); borderline personality disorder (R. 829); and substance abuse, which "has had no more than a minimal impact on the claimant's ability to perform work activity." *Id.*[10]

At step three, the ALJ compared Ms. Cordero's impairments to those contained in the "Listings."[11] The ALJ concluded that none of Ms. Cordero's impairments, alone or in combination, met or equaled the criteria of any of the Listings. R. 829-31. Reaching this conclusion, the ALJ specifically ruled out Listing § 11.02 (relating to epilepsy), Listing § 1.04A (relating to cervical and lumbar spine impairments), and Listings §§ 12.04, and 12.06 (relating to mental impairments). *Id.*

The sequential evaluation then proceeded to step four, prior to which the ALJ determined Ms. Cordero's residual functional capacity ("RFC"). 20 C.F.R. § 416.945(a). To determine Ms. Cordero's RFC, the ALJ reviewed the available medical opinion evidence. Based on this review, the ALJ concluded that Ms. Cordero is able to perform sedentary work, with some exceptions.[12] R. 854. These exceptions include:

> [Ms. Cordero] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; never be exposed to work

---

[10] I have found no evidence of recent substance abuse in this record, only a suggestion in the ALJ's opinion that in July 2010 Ms. Cordero reported to Lehigh Valley Community Mental Health Center (LVCMHC) that she had self-medicated with alcohol and marijuana in the past, but that marijuana "made her paranoid." R. 824. There is no record cite in the decision, but it appears to refer to a patient history at R. 617-31. I have not located any other reference to substance abuse in the record.

[11] The regulations contain a series of "Listings" that describe symptomology related to various impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant's documented symptoms meet or equal one of the listed impairments, "the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). If not, the sequential evaluation continues to step four, where the ALJ determines whether the impairments assessed at step two preclude the claimant from performing any relevant work they may have performed in the past. *Id.*

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

involving unprotected heights, moving mechanical parts, or operating a motor vehicle; occasionally be exposed to work involving humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and vibration; no more than moderate noise; can perform, use judgment, and tolerate occasional changes in a routine work setting defined as that consistent with routine and repetitive tasks; and can have occasional interaction with supervisors, coworkers, and the public.

R. 832.

In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" as required by Social Security regulations 20 CFR § 404.1529 and SSR 16-3P. He also advised that he "considered opinion evidence in accordance with the requirements of 20 CFR § 404.1527." R. 832. Following this recitation, the ALJ discussed Ms. Cordero's testimony, concluding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . .". R. 833. The ALJ also wrote nearly seven pages detailing the opinions of numerous treating and consulting physicians. He rejected all, or portions of, every opinion by a treating or consulting examiner. R. 833-40. He gave Ms. Cordero's mother's third-party function report "little weight." R. 837.

The ALJ then found that Ms. Cordero has no past relevant work. R. 840. He concluded that her past employment as a cashier, production assembler and home health aide did not qualify as substantial gainful activity. *Id.*

Having found no past relevant work that Ms. Cordero could perform, the ALJ proceeded to Step Five. Accepting the testimony of the vocational expert at the April 11, 2019 hearing, that jobs existed in sufficient numbers for a hypothetical individual who

could perform sedentary work, further limited by the physical limitations set forth in the Residual Functional Capacity (RFC) finding, *supra* at 5, with mental limitations stated as: "can perform, use judgment, tolerate occasional changes in routine work setting, defined as that consistent with routine repetitive tasks; can have occasional interaction with supervisors, coworkers and the public," R. 900, the ALJ found Ms. Cordero not disabled, as she could perform work as an "optical lens inserter," a "table worker," or a "master," as those terms are defined by the Dictionary of Occupational Titles." R. 841-42.[13]

Because the ALJ identified jobs Ms. Cordero could perform, he ultimately concluded that Ms. Cordero is "not disabled." R. 842.

## IV.   **STANDARD OF REVIEW**

### A.  **Legal Standards.**

Ms. Cordero has the burden of showing that the ALJ's decision was not based on "substantial evidence." 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). "Substantial evidence" is not a high standard. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and internal quotations omitted).

I exercise "plenary review over questions of law." *Newell v. Commissioner of Social Security*, 347 F.3d 541, 545 (3d Cir. 2003) (citation omitted). I must determine whether the ALJ applied the proper legal standards in reaching the decision. *See Coria*

---

[13] The Vocational Expert testified at the hearing in response to questioning by the ALJ with regard to absences from sedentary, unskilled work. R. 904-05. He advised the ALJ that based on his experience and knowledge, "absenteeism greater than one day per month would ultimately lead to no SGA [substantial gainful activity]." *Id.* at 905. Likewise, the VE testified that being "off-task" for 20% of an eight-hour workday would be work preclusive. *Id.* The ALJ did not discuss this testimony in his decision.

*v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984); *see also Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (3d Cir. 2012) (citing to *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)). Accordingly, I can overturn an ALJ's decision based on a harmful legal error even when I find that the decision is supported by substantial evidence. *Payton v. Barnhart*, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006) (citing *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983).

An ALJ must provide sufficient detail in his opinion to permit meaningful judicial review. *Burnett v. Commissioner of Social Security Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). When dealing with conflicting medical evidence, the ALJ must describe the evidence and explain his resolution of the conflict. As the Court of Appeals observed in *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999),

> when a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993). The ALJ must consider all the evidence and give some reason for discounting the evidence [she] rejects. *See Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

While it is error for an ALJ to fail "to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination . . .", *Burnett*, 220 F.3d at 121, an ALJ's decision is to be "read as a whole" when applying *Burnett. See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Caruso v. Commr. of Soc. Sec.*, 99 Fed. Appx. 376, 379–80 (3d Cir. 2004) (unpublished) (examination of the opinion as a whole permitted "the meaningful review required by *Burnett,*" and a finding that the "ALJ's conclusions [were] . . . supported by substantial evidence.") The issue is whether, by reading the ALJ's opinion as a whole against the record, the reviewing court can understand why the ALJ came to her

decision and identify substantial evidence in the record supporting the decision. *Id*. at 379. I must rely on the record developed during the administrative proceedings along with the pleadings in making my determination. *Trinh*, 900 F.Supp.2d at 518; *see also* 42 U.S.C. § 405(g). I may not weigh the evidence or substitute my own conclusions for those of the ALJ. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). I must also defer to the ALJ's evaluation of evidence, assessment of the witnesses, and reconciliation of conflicting expert opinions. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 506 (3d Cir. 2009).

**B. The Instructions Contained in the Remand.**

Magistrate Judge Perkin issued a Report and Recommendation on March 12, 2018, in which he instructed that on remand, the ALJ must comply with the requirements of 20 C.F.R. § 416.927(c)(1-6) in any instance where he declines to give a treating source's opinion controlling weight. R. 957. Judge Perkin specifically stated that the ALJ is required to discuss:

> The examining relationship, the treatment relationship, including the length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, the supportability of the medical opinion, the consistency of the medical opinion with the record, the specialization of the treater, and any other factors that tend to support or contradict the medical opinion.

*Id*. He found that the original ALJ failed to discuss these steps in rejecting the opinion of treating psychiatrist Dr. Raghavendra Siragavarapu in the original decision, as well as noting that, "it is likewise unclear how much weight, if any, the ALJ actually assigned to the opinion of Plaintiff's treating psychiatrist." *Id*. Judge Perkin found that because of this error, meaningful review of the ALJ's decision was not possible. R. 960.

Judge Perkin also recommended remand because the ALJ "completely failed to mention the statement made by Plaintiff's mother on behalf of Plaintiff." R. 958. He noted that at the time, the Plaintiff's mother "lives with [Ms. Cordero] and observes her every day, but there is no mention of this statement by the ALJ in his decision." R. 959. Judge Perkin noted this failure is error "because an ALJ must consider all relevant evidence when determining an individual's residual functional capacity, including medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others," citing 20 C.F.R. §§ 404.1529, 416.929, 404.1545(a)(1), (3), 416.945 (a)(1), (3); *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). Judge Perkin noted that, "[o]rdinarily, the failure to consider third-party statements constitutes reversible error," citing *Diggs v. Colvin*, No. 13-cv-4336, 2015 WL 3477533 at *3 (E.D. Pa. May 29, 2015) (Schmehl, J.) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000)); *Zerbe v. Colvin*, 2014 WL 2892389 (M.D. Pa. June 26, 2014).

I will examine the second assigned ALJ's decision with the instructions provided by Judge Perkin in the earlier remand in mind.

## V.   DISCUSSION

### A. The ALJ's opinion was not based on substantial evidence.

ALJ Ryan Hoback wrote a 26-page, single-spaced opinion, in which he detailed some of Ms. Cordero's treatment records by four specialists, neurologists Dr. Lim and Dr. Malik, and psychiatrists Dr. Siravaragapu and Dr. Lirag. Each of the four treating specialists provided opinions in which they detailed Ms. Cordero's severe impairments, and rendered opinions that supported a finding that Ms. Cordero is unable to sustain

full-time employment. With respect to each of the four specialists' opinions, however, ALJ Hoback assigned "little weight." The ALJ's reasons for disregarding the opinions, however, are legally flawed and lack support in the record. Ultimately, the ALJ reached a conclusion that Ms. Cordero retained the residual functional capacity to perform sedentary work, based on this flawed reasoning.

### 1. *The ALJ's use of "noncompliance."*

The ALJ rejected the opinions of all four treating doctors, as well as some of the consulting examiners' opinions, for the stated reason that each opinion failed to take into consideration Ms. Cordero's "noncompliance" with her treatment. R. 835, 838, 840. This was error, and resulted in the ALJ improperly weighing the opinions of all four of Ms. Cordero's treating specialists.

The term "noncompliance" is used in two distinct ways by the Social Security Administration when evaluating disability. First, there is the "official" use of the term, pursuant to the Social Security Regulations. Second, ALJ's frequently use the term "noncompliant" in a more colloquial sense, as a reason to reject some or all of a claimant's subjective testimony with respect to the severity of her impairments. Here, the ALJ conflated the two, using "noncompliance" as a reason to reject the medical opinions of her treating doctors, without conducting the proper analysis pursuant to the Regulations. This was error.

The Social Security Administration provides a specific outline to Administrative Law Judges who believe a claimant is noncompliant with treatment. Before relying upon "noncompliance" as a basis to deny benefits, an ALJ is required, pursuant to SSR 82-59, to address the following:

SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . .; and
2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

Treatment Must be Prescribed by Claimant's Treating Source

A treating source(s) is any duly licensed physician(s) who is actually attending to the claimant's or beneficiary's medical needs. Where the individual does not have an attending physician, the treating physician(s) in the hospital, clinic, or other medical facility where the individual goes for medical care will be considered the treating source.

*Titles II & XVI: Failure to Follow Prescribed Treatment*, SSR 82-59 (S.S.A. 1982).

My review of Ms. Cordero's file has uncovered no treatment, prescribed by a treating source, that is "clearly expected to restore capacity to engage in any SGA." Rather, a fair reading of the record as a whole reveals multiple specialists prescribing various medications and treatments in an attempt to give Ms. Cordero some relief from her multiple severe impairments. On numerous occasions, these treatments or medications provided no relief, or worse, caused harm.[14] Rather than "noncompliance,"

---

[14] On at least two occasions, Ms. Cordero was taken to the emergency room with painful kidney stones, caused by her medications. *See* R. 1305-24; 1445-85. On multiple occasions, Ms. Cordero reported to her treating physicians that she stopped taking medication because it was causing serious weight gain. R. 399, 467, 561,653, 721. The file records Ms. Cordero's weight, at various times, as between 126 and 220

a reading of the record as a whole demonstrates "trial and error" on the part of multiple specialists treating multiple impairments.[15] The ALJ's error in not undertaking the required "noncompliance" analysis is certainly not harmless, because this record could never support a finding that Ms. Cordero rejected treatment that would have cured her. Her counsel pointed out as much in a detailed letter to the Appeals Council in an effort to convince them to correct this obvious error by the ALJ:

> [I]t is fundamentally unclear how the claimant can be deemed "noncompliant," when the treatment record consists of thousands of pages of treatment notes and 42 medical exhibits. The ALJ himself noted on multiple occasions that the record showed the claimant was taking her medications (Decision, p. 7). A noncompliance evaluation is essential, because it appears that in this instance it is simply the ALJ making an assertion he had no authority or expertise to make. The actual record (specifically, the record the ALJ cited to assert that the claimant was noncompliant) showed that despite taking her medications, the claimant was still experiencing seizures (Exhibit 42F/47). The record itself shows early on that the claimant actually had "good compliance" with her medication regimen and still continued to experience issues (Exhibit 14F/49).

Letter by Charles Binder, Esq., dated August 30, 2019, to the Appeals Council, R. 1062.

The ALJ's repeated statements that Ms. Cordero's treating physicians failed to take her "noncompliance" into account in rendering their respective opinions is also belied by the facts in the record. This is not a case in which the patient either hides her "noncompliance" from her physician, or flatly refuses to undergo treatment that her

---

pounds. *Id.*; R. 581, 1159. Therefore, her physicians rightly monitored any sudden weight changes when treating her.

[15] For instance, on April 22, Dr. Lim's progress notes included a report that Ms. Cordero expressed worry that the drug valproate was causing weight gain, but agreed to abide by Dr. Lim's decision on which medication to start next. R. 1579. "She has a difficult time following directions to take medications three times a day (gabapentin) because she will forget her afternoon dose." *Id.* "She has tired (sic) so many medications for her depression and anxiety including Cymbalta, Zoloft, Prozac, Buspar, Lithium, Xanax, Klonopin, Seroquel and many others." *Id.* In the narrative, Dr. Lim stated that, "Ms. [Cordero] severely needs better psychiatric control of her anxiety. But, her pessimism is interfering with her willingness to participate in therapy." R. 1583.

doctor tells her will cure her impairment. Rather, the medical records contain instances where Ms. Cordero reported directly to her treating physicians that she had stopped taking a particular medication, because it was not working, it was causing serious weight gain, or, in at least one instance, because her insurance no longer covered its cost. *See e.g.*, R. 644, 696. In each instance, the physicians worked with Ms. Cordero in an attempt to find a treatment that would work, without debilitating side effects. Therefore, although the treating specialists' opinions did not specifically discuss changes in medication, or failure to take medication, all of the treating doctors were well aware of the difficulties Ms. Cordero experienced with her treatments, when those opinions were rendered. The ALJ cites to no instance in which a treating physician states that, if Ms. Cordero would only take her medication, her impairments would vanish, and my review of the record finds no such statement.

It is especially problematic for an ALJ to so casually apply a "noncompliant" label to a claimant suffering from severe psychiatric problems. As noted in SSR 16-3p, 2016 WL 1119029, the decreased insight and judgment accompanying severe mental impairments may be a reason that medication or treatment protocols are not strictly followed. Additionally, psychiatric medications frequently cause severe side-effects, as was the case here, where Ms. Cordero suffered weight fluctuations of nearly 100 pounds. Such side effects may cause an individual to avoid a particular prescription medication, and SSR 16-3p specifically directs that such reason for noncompliance should be taken into consideration.[16] Federal courts have repeatedly noted that the mental impairment itself may cause the noncompliance, as "people with serious psychiatric problems are

---

[16] Although Ms. Cordero's claim was filed prior to the issuance of this Ruling, ALJ Hoback stated in his opinion that he reviewed the Ruling and followed its guidance. R. 832.

often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). "[I]t is a common phenomenon that a patient functions well with medication, yet because of the mental illness itself, lacks the discipline or capacity to follow the regime the medication requires." *Olmstead v. L.E. ex rel. Zimring*, 527 U.S. 581, 610 (1999) (Kennedy, J., concurring). It can hardly be surprising that an individual also attempting to manage epileptic seizures and intractable migraine headaches with medication would be in a worse position to manage her psychiatric medications than one dealing with psychiatric impairments alone.

Here, the ALJ's rejection of the opinions of all four treating physicians because, in part, he believed Ms. Cordero was "noncompliant" with her prescribed treatment, and the physicians failed to take noncompliance into account in rendering their respective opinions, was error. As a result, the ALJ failed to give appropriate weight to the opinions of Ms. Cordero's four treating specialists.

In contrast to the definition of "noncompliance" used in the Social Security Regulations, an ALJ may also use evidence of a claimant's failure to take prescribed medication as a factor in analyzing a claimant's credibility. The Third Circuit has found this use of the term "noncompliance" to be appropriate. *See Vega v. Comm'r of Soc. Sec.*, 358 F. Appx. 372, 375 (3d Cir. 2009):

> However, it was not Vega's noncompliance with her treatment that was the basis for the denial of benefits; rather, it was her residual functional capacity to return to sedentary work. Viewed in the context of the ALJ's findings as a whole, his reference to Vega's noncompliance shows *that he treated it as a factor in analyzing the credibility of Vega's testimony*. Because an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reason, *see* SSR 96–7p, this was not improper.

*Id.* (Emphasis added). *See also Showell v. Colvin*, No. 14-cv-7081, 2016 WL 3599569 (E.D. Pa. Jul. 1, 2016) (Schmehl, J.) (upholding ALJ's decision where plaintiff's neuropathy symptoms improved when compliant with his doctor's recommendations, and "aside from Plaintiff's own testimony, the medical record was devoid of any limitations on Plaintiff's ability to stand and/or walk."). That is not what happened here. Instead, the ALJ dismissed vast swaths of medical opinion evidence with a laconic mention of "noncompliance," without doing the analysis required under the regulations. It was legal error to ignore the required analysis. And my own review of the record convinces me that it does not support a finding of "noncompliance" in the sense defined by the regulations.

> 2.  *The ALJ improperly handled the treating doctors' opinions.*

It is well-settled that an ALJ should give "treating physicians' reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Comm'r. of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008), quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) and *Plummer*, 186 F.3d at 429. Contradictory evidence is required in order for an ALJ to reject a treating physician's opinion outright. *Id*. Here, not one, but *four* treating specialists considered Ms. Cordero to be severely impaired, and each provided opinions supported by treatment notes of multiple years' duration.

Indeed, pursuant to Social Security Regulations, the ALJ must assign controlling weight to any well-supported treating source medical opinion unless the ALJ identifies substantial inconsistent evidence. *See* 20 C.F.R. § 404.1527(c)(2). The Third Circuit consistently holds that lay reinterpretation of medical evidence is not substantial evidence to decline to adopt a treating source medical opinion. *Burns v. Colvin*, No.

1:14–CV–1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). The Regulations retained, rather than abrogated, this precedent. *Id.* Thus, the ALJ may not assign less than controlling weight to a well-supported treating source medical opinion with lay reinterpretation of medical evidence.

The ALJ rejected the majority of the four treating physicians' opinions in favor of giving "partial weight" to the opinion of Luka W. Cohen, Ph.D.,[17] as well as several consulting physicians who were not specialists in psychiatry or neurology, and who rendered their opinions prior to the first hearing in 2014. I examine each opinion, and the treatment records on which they were based, in detail. This serves to illustrate that the treating physicians' opinions were well founded and that the ALJ's dismissal of the opinions based on Ms. Cordero's supposed "noncompliance" was not only error, but harmful. The exercise also satisfies me that reversal, and not remand, is the proper remedy in this case.

a.  *The Treating Physicians' Records and Opinions.*

i. *Dr. Kuei-Cheng Lim.*

Dr. Kuei-Cheng Lim[18] of St. Luke's University Hospital's Neurology Associates treated Ms. Cordero for epilepsy and migraine headaches beginning in August of 2014. R. 1224. Records for Dr. Lim contain detailed notes of his treatment of Ms. Cordero for both epilepsy and migraines.

---

[17] The Commissioner incorrectly identifies Dr. Cohen as an "M.D." (medical doctor) in her brief. Resp. at 4. Dr. Cohen has a Ph.D. according to the record. R. 40. A Google search on February 16, 2022 for "Luka W. Cohen," using both "M.D." and "Ph.D." turned up no results. The Commissioner cites Dr. Cohen's testimony as the only evidence used by the ALJ as contradictory to the treating physicians, and I can find no other medical evidence in the record or in the ALJ's opinion that he relies upon as substantial evidence which is contradictory to the treating specialists' opinions.

[18] Dr. Lim is board-certified in neurology in Pennsylvania and New Jersey, and specializes in the treatment of epilepsy and headaches. https://www.doximity.com/pub/kuei-cheng-lim-md.

In April 2017, after Ms. Cordero suffered a bad fall during an epileptic seizure, Dr. Lim ordered a prolonged hospital stay in an effort to monitor her on a constant basis in order to capture a seizure in real time. On her admission to the hospital, Dr. Lim detailed Ms. Cordero's medical history, noting that she had "intractable" epilepsy, with recurrent generalized convulsions 1 to 3 times per month "despite trials of four antiseizure medications and [the surgical insertion of] a vagus nerve stimulator." R. 1537. He also found it notable that Ms. Cordero had "memory problems and poor concentration/attention," which resulted in her incorrectly taking her medications or self-discontinuing medication. R. 1540.[19] A prior hospital stay had failed to capture a seizure but an EEG confirmed "left frontal discharge," consistent with earlier EEG studies confirming "generalized discharges." R. 1537.

Dr. Lim also noted that Ms. Cordero's "daily headaches" were not relieved by doses of doxepin, zolpidem, or zaleplon. *Id*. Those headaches continued through her hospital stay and were not relieved by doses of Fioricet. *Id*. Dr. Lim documented that Ms. Cordero's headaches had been treated with "a number of preventative medications, verapamil, topiramate, magnesium, riboflavin and Botox. There has not been significant change to headache frequency or severity." R. 1540. Despite treatment Ms. Cordero

---

[19] During Ms. Cordero's April 2017 hospital stay to monitor her epilepsy, she was also evaluated by Thomas Sugalski, Ph.D., a psychologist and clinical neuropsychologist. R. 1549-50. Dr. Sugalski identified impairments in Ms. Cordero's general cognitive functioning, attention/concentration, frontal systems/executive functioning, language functioning, memory functioning, and visuo-spatial abilities. R. 1549. The report included a Cognitive Functioning Summary and Emotional Functioning Summary, which documented "deficits/weaknesses in auditory and visual memory systems, auditory vigilance and selective attention, information processing speed, visual attention and tracking[.]" R. 1550. Dr. Sugalski's official impression included mild neurocognitive disorder, major depressive disorder, generalized anxiety disorder, and R/O borderline personality disorder. His recommendations included weekly counseling to decrease depressive cognitions and improve coping ability, biofeedback training to decrease anxiety, and cognitive-behavioral intervention to identify triggers for anxiety and management strategies. *Id*. He believed Ms. Cordero is "a candidate for psychotropic medications for depression and anxiety as deemed appropriate by her physician." *Id*.

continued to experience headaches 2-3 times a week, each lasting all day with a component of nausea, relieved only by retreating to a quiet dark room. A five-day course of Dexamethasone was administered, without significant improvement to headache frequency or quality. Sumatriptan also failed to relieve or decrease the frequency of her headaches. Dr. Lim noted that, "[s]he even had a cervical anterior spinal diskectomy for suspected cervicalgia (C6-7 central protrusion disc herniation with near cord compression)," which also did not relieve her chronic daily headaches. R. 1540.

Dr. Lim weaned Ms. Cordero off of her seizure medication and deprived her of sleep during her hospital stay in an attempt to trigger a seizure,[20] without success. He noted that Ms. Cordero exhibited severe anxiety, "to the point that she was restless, constantly tapping her legs, and feeling hot." *Id.*

Dr. Lim completed a "seizures impairment questionnaire" in January 2019 for Ms. Cordero's attorneys. R. 1224-29, 1259-64.[21] Dr. Lim advised that Ms. Cordero suffered from "focal unaware seizures" and "tonic-clonic [grand mal] [epileptic] seizures that are not controlled." R. 1224. She suffers one to two seizures per month. R. 1225. He has treated Ms. Cordero with Lamotrigine and phenobarbital, however, he was forced to reduce the Lamotrigine in January 2019 due to "medication combination" causing blood level issues. R. 1226. He opined that the seizures are "lifelong," and they cause Ms. Cordero to be tired and confused for "a couple of" hours after they occur. *Id.* He opined that her symptoms are severe enough to interfere with her attention and concentration "frequently," and she is therefore capable of only "low stress" in a work setting. R. 1227.

---

[20] The ALJ incorrectly stated that during this hospital stay, "her chronic insomnia was not present during this admission, as she is able to initiate and maintain prolonged periods of sleep." R. 828.

[21] These appear to be two copies of the same form.

Dr. Lim had no reason to suspect that Ms. Cordero "faked" her symptoms or was otherwise malingering, and he advised that she had long running, "overwhelming anxiety, difficulty with memory, focus, and frequent headaches," which contributed to his opinion that she is unable to hold down full-time employment. *Id*. Additionally, her "intractable epilepsy" was, in Dr. Lim's opinion, work-preclusive. *Id*.

At R. 834-35, the ALJ discussed Dr. Lim's treatment records and opinion regarding Ms. Cordero's epilepsy and migraine headaches. The ALJ noted that Dr. Lim opined that Ms. Cordero's symptoms "would frequently interfere with her attention and concentration," and that "[s]he would be absent from work two to three times per month and would need breaks from the workplace due to headaches." R. 834. He also described Dr. Lim's medical assessment form "stating that the claimant was disabled for unknown duration due to recurrent seizures occurring at least one to three times per month," and that her "diagnoses include localization related symptomatic epilepsy and epileptic syndromes with complex partial seizures [and] intractable and chronic migraine without aura." R. 835. The ALJ included a lengthy paragraph relating information from Dr. Lim on March 7, 2019, which included Dr. Lim's detailed information concerning the effects of her seizures, and providing specific limitations with regard to her inability to work at heights, operate machinery or a motor vehicle, or tolerate temperature extremes due to her intractable epilepsy, that her symptoms would "frequently interfere with her attention and concentration," that she could tolerate only "low work stress," and that she suffered from "overwhelming anxiety and [has] difficulty with memory, focus, and

frequent headaches." *Id*. The ALJ acknowledged that Dr. Lim stated that Ms. Cordero "is unable to work due to intractable epilepsy."[22] *Id*.

Despite the ALJ acknowledging all of these detailed findings, his actual analysis and discussion of Dr. Lim's treatments and opinions was short, giving "little weight to these opinions from Dr. Lim." His reasoning for completely discounting the detailed opinion and lengthy records of her treating neurologist was limited to the following:

> They do not adequately address and fully consider the effects of her noncompliance with treatment. Moreover, they do not include a function by function assessment, are not consistent with the record as a whole as previously discussed, and ultimately the opinion as to disability is reserved to the Commissioner.

*Id*.[23]  The failure to properly analyze "noncompliance" was error.

### ii. Dr. Bushra Malik.

Just as he did with Dr. Lim's opinion, the ALJ wrote in detail on Ms. Cordero's years of treatment with Dr. Bushra Malik,[24] and then dispatched Dr. Malik's opinion with a cursory mention of Ms. Cordero's supposed "noncompliance." This was error.

Dr. Malik treated Ms. Cordero beginning in at least January 2011 for headaches and seizures. R. 507-510. Dr. Malik ordered an EEG on January 20, 2011, which confirmed the presence of generalized sharp-and-wave and spike-and wave activity,

---

[22] This paragraph of the ALJ's opinion includes the statement, without page cite, that Ms. Cordero "is compliant with her medication." R. 835.

[23] The ALJ's suggestion that Dr. Lim's opinion and records did not provide a "function by function assessment" is perplexing, since the ALJ actually included Dr. Lim's detailed information concerning the effects of her seizures and headaches, as just described. *Id*. The ALJ's failure to properly address the supposed noncompliance was error, and not harmless.

[24] Dr. Bushra Malik is board-certified in neurology and licensed in Pennsylvania and New Jersey. https://www.doximity.com/pub/bushra-malik-md.

which demonstrated the presence of a generalized seizure disorder. R. 512. This appears to be the earliest medical evidence of Ms. Cordero's epilepsy in the record.

Dr. Malik had been regularly seeing Ms. Cordero for treatment every three months from January 2011 through January 2019 when the doctor prepared a questionnaire for Ms. Cordero's attorney detailing the plaintiff's treatment for tension and migraine headaches. While Ms. Cordero sometimes experiences tension headaches on a daily basis, her much more serious migraine headaches are documented at four to five per month, each lasting more than one day, and frequently causing vomiting, as well as a complete inability to handle light or sound, requiring Ms. Cordero to retreat to a dark room. R. 1215-16.

Dr. Malik treated Ms. Cordero's headaches with Botox injections, and in January 2019 Dr. Malik advised that these injections had somewhat decreased the frequency of her migraines. R. 1218.[25] Dr. Malik advised that in January 2019 she prescribed Toradol, Compazine and sumatriptan injections for pain relief. R. 1217. She also stated that Ms. Cordero had previously tried, without success: Topamax 150 mg, Keppra 300 mg, Oxycarbazapine 300 mg, Lyrica, Buspirone, Inderal, Verapamil, gabapentin, Lamictal, Olanzapine, Tizanidine, Protriptyline, Effexor, Fioricet, Maxalt, Naproxen, Dexamethasone, and Excedrin for relief of her headaches. R. 1218. Dr. Malik opined that based on her long-term relationship with Ms. Cordero, she believed she would be incapacitated from performing even basic work more than three times per month. R. 1219.

The ALJ gave Dr. Malik's opinion "little weight" because:

---

[25] Ms. Cordero testified, however, that they provided little in the way of pain relief when she did get a migraine headache. R 884-85.

It is not consistent with [the] record as a whole as previously discussed. The records show the claimant has not been complaint (sic) with treatment. She also cares for herself and her child. She performs regular tasks at home.

R. 835. This was error, and not harmless.

### iii. Dr. Siragavarapu.

The ALJ erroneously dismissed the opinion of Board-certified Psychiatrist Raghavendra Siragavarapu,[26] who treated Ms. Cordero's bipolar disorder, depression, and anxiety, monthly for nearly three years, from June 2011 until March 2014, before completing a psychiatric/psychological impairment form on March 4, 2014. While the form is structured as a "check-the-box" analysis, it is backed up by detailed records of Ms. Cordero's[27] monthly visits with Dr. Siragavarapu, as well as a colleague, Sachidanand D. Kamtam, M.D., whose name appears on a number of the session notes in the file. R. 717-9, 721.[28]

---

[26] Dr. Siragavarapu is board-certified in psychiatry and is affiliated with Temple University Hospital. https://www.doximity.com/pub/raghavendra-siragavarapu-md.

[27] The majority of these records refer to the Plaintiff by the name "Lorraine Saad." There is no indication in the record that Ms. Cordero and Ms. Saad are not the same individual.

[28] The form, which was prepared by attorneys Binder and Binder, a firm specializing in Social Security disability, included categories that correspond to the "Paragraph A" criteria in Listing 12.04, Depressive, bipolar and related disorders (see 12.00B3), which requires a doctor's finding that a patient satisfies Paragraph A, along with either Paragraph B, or C (discussed *infra* at n. 36, p. 27). The Paragraph A criteria are:
A. Medical documentation of the requirements of paragraph 1 or 2:
    1. Depressive disorder, characterized by five or more of the following:
        a. Depressed mood;
        b. Diminished interest in almost all activities;
        c. Appetite disturbance with change in weight;
        d. Sleep disturbance;
        e. Observable psychomotor agitation or retardation;
        f. Decreased energy;
        g. Feelings of guilt or worthlessness;
        h. Difficulty concentrating or thinking; or
        i. Thoughts of death or suicide.
    2. Bipolar disorder, characterized by three or more of the following:
        a. Pressured speech;
        b. Flight of ideas;
        c. Inflated self-esteem;

Dr. Siragavarapu diagnosed Ms. Cordero as suffering from bipolar disorder,[29]

depression, and generalized anxiety disorder. R. 741. He noted her current GAF score

(in March 2014) matched her lowest GAF score for the past year, at approximately 35-

40.[30] *Id*. Her prognosis for improvement was "guarded." *Id*. The doctor listed the

clinical findings, all of which are backed up by the treatment notes, as: (1) appetite

disturbance with weight change;[31] (2) mood disturbance; (3) emotional lability; (4)

recurrent panic attacks; (5) feelings of guilt/worthlessness; (6) decreased energy; (7)

---

d. Decreased need for sleep;
e. Distractibility;
f. Involvement in activities that have a high probability of painful consequences that are not recognized; or
g. Increase in goal-directed activity or psychomotor agitation.

[29] "Bipolar disorder" includes Bipolar I disorder, formerly referred to as "manic-depressive disorder" or affective psychosis, differing from the classical description to the extent that neither psychosis nor a lifetime experience of a major depressive episode is a requirement. The definition also includes "Bipolar II disorder," which requires a lifetime experience of at least one episode of major depression and at least one hypomanic episode. Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, 2013 ("DSM-V"), p. 123.

[30] Although Global Assessment of Functioning, ("GAF") scores are no longer used as a diagnostic tool for assessing a patient's functioning due to their questionable probative value, *see* DSM-V, p. 16, when a claimant exhibits low GAF scores (consistently under 50) for long periods of time, and when multiple physicians agree that the claimant has such low scores, there is nothing in the case law that forbids my taking that into account as a factor in determining whether the ALJ properly evaluated a claimant's medical history. *See e.g. Rivera v. Astrue*, 9 F.Supp.3d 495, 504-05 (E.D. Pa. 2014) (Savage, J.) ("the Third Circuit has yet to address in a precedential opinion whether an ALJ's failure to discuss numerous GAF scores requires remand. The district courts in the Third Circuit have repeatedly held that the ALJ's failure to specifically discuss a GAF score that supports serious impairments in social or occupational functioning is cause for remand." (Collecting cases - citations omitted)). The GAF scale is "used by mental health professionals to assess current treatment needs and provide a prognosis." *Nixon v. Colvin*, 190 F. Supp. 3d 444, 447 (E.D. Pa. 2016) (quotations omitted). A score of "50 or below indicates serious symptoms, while a GAF score of 51 through 60 indicates moderate symptoms." *Id*. In recent years, the GAF scale has "fallen somewhat into disfavor," however the Social Security Administration continues to receive and consider GAF in medical evidence and adjudicators consider GAF scores with all of the relevant evidence in the case file. *Nixon*, 190 F. Supp. 3d at 447 (quotations omitted). *See Ven Ouk v. Berryhill*, No. CV 16-5509, 2018 WL 1898766, at *5 (E.D. Pa. Apr. 20, 2018). Here, the Plaintiff's GAF scores never were above 50, and usually hovered in the 35-45 range. Had the ALJ's opinion not suffered from so many other errors, I would have included a detailed discussion of the ALJ's dismissal of Ms. Cordero's consistently low GAF scores, as another reason for rejecting the opinion.

[31] Plaintiff, who is approximately five feet, seven inches tall, has documented weights in the record at various times that fluctuate between as high as 220 pounds and as low as 126 pounds. *See e.g.*, R. 1154, 1177.

generalized persistent anxiety; and (8) hostility and irritability. R. 742. Her most prevalent symptoms were racing thoughts, panic attacks and insomnia. R. 743. In response to a specific inquiry on the form, Dr. Siragavarapu (and all of her other physicians) advised that Ms. Cordero does not present as a "malingerer."[32] R. 747. In her treating psychiatrist's opinion, Ms. Cordero's symptoms and limitations were reasonably consistent with her documented conditions. R. 743.

Dr. Siragavarapu was asked to assess Ms. Cordero's capacity to handle various situations using a rating scale that digressed from "no evidence of limitation" to "markedly limited" in her ability to handle the basic skill described. R. 743. The skills were grouped into (1) understanding and memory; (2) sustained concentration and persistence; (3) social interactions; and (4) adaptation skills. R. 744-45.[33] He rated Ms. Cordero's ability to handle the following skills as "markedly limited," in the following areas:

(1) Understanding and memory:
- The ability to remember locations and work-like procedures.
- The ability to understand and remember one or two step instructions.[34]
(2) Sustained concentration and persistence:
- The ability to carry out detailed instructions.[35]
- The ability to maintain attention and concentration for extended periods.

---

[32] Miriam Webster's online dictionary defines "malinger" as: "to pretend or exaggerate incapacity or illness (as to avoid duty or work)." https://www.merriam-webster.com/dictionary/malingerer.

[33] These categories roughly correspond to the "Paragraph B" criteria detailed at n.36, page 27, *infra*.

[34] For the corresponding, "ability to understand and remember detailed instructions," Dr. Siragavarapu stated that he did not have available evidence to rate his patient, suggesting that he had never progressed beyond one- or two-step instructions with Ms. Cordero.

[35] In this corresponding category of "sustained concentration," as opposed to the first category of "understanding and memory," Dr. Siragavarapu found a moderate limitation in her ability to carry out simple one- or two-step instructions—indicating that if given a simple instruction, Ms. Cordero could carry it out immediately, but that her ability to remember and carry out instructions over time was impaired.

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.
- The ability to work in coordination with or proximity to others without being distracted by them.
- The ability to make simple work-related decisions.

(3) Social interactions:

- The ability to interact appropriately with the general public.
- The ability to ask simple questions or request assistance.
- The ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

(4) Adaptation:

- The ability to be aware of normal hazards and take appropriate precautions.
- The ability to set realistic goals or make plans independently.

*Id.* at 744-46.[36]

---

[36] These categories parallel those found at Paragraph B of Listing 12.04, which requires the ALJ to determine what level of limitation plaintiff's mental impairment imposes on his ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence and pace, and whether she has had repeated episodes of decompensation for extended duration.

Paragraphs B and C of Listing 12.04 read as follows:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

1. ...

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
Or
C. Medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of one of more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, subpt. P., app. 1, § 12.04.

...

1. Activities of Daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence,

On the date the opinion form was prepared, Ms. Cordero was taking Ambien, Lithium, Seroquel XR, and Buspar for her psychological impairments. R. 746. Dr. Siragaravapu believed that Plaintiff experienced episodes of deterioration or decompensation in a work- or work-like setting, causing her to withdraw from the situation or experience exacerbation of signs and symptoms. *Id*. His three years of sessions documented that Ms. Cordero experienced both "good" and "bad" days, and that she was likely incapable of tolerating even "low stress" work. He estimated that she would be absent from work more than three times per month as a result of her

---

appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

§ 12.00(C)(1).

2. Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.

...

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

§ 12.00(C)(2).

3. Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

...

We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis. We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.

§ 12.00(C)(3).

impairments or treatment. R. 748. Dr. Siragavarapu's treatment notes span approximately 110 pages and contain notations consistent with the statements made by the doctor in his opinion.

The ALJ listed all of the areas in which Dr. Siragavarapu found Ms. Cordero had a marked limitation, as well as the several areas in which he found a moderate limitation. R. 838. The ALJ gave the opinion "little weight." Dr. Siragavarapu provided a second opinion on July 12, 2014, apparently as part of his monthly treatment records, although it is difficult to tell as the document, R. 800, is a single page, beginning with "Section II" at the top, and separated in the record as Exhibit No. 21F, and not a part of Exhibit 20F, which are monthly session progress notes. The single page notes that Ms. Cordero is "temporarily disabled – 12 months or more," from June 27, 2011 to July 17, 2015, as a result of a primary diagnosis of "bipolar disorder (unintelligible)." The document states that the assessment is based upon a review of her medical records and is dated July 17, 2014. The ALJ gave "little weight to this opinion. It does not include a function by function assessment and ultimately the opinion as to disability is reserved to the Commissioner." R. 839.

The ALJ dismissed the opinion of Dr. Siragavarapu with the following statement:

The opinion is inconsistent with the record as a whole as previously discussed and internally inconsistent. For example, the extreme mental limitations are not consistent with the routine and conservative treatment the claimant has received nor the routinely adequate mental status examinations. *See e.g.*, Exhibits 9F, 14F, 19F and 20F). Additionally, the doctor opined as to significant mental limitations while simultaneously opining the claimant could manage benefits in her own best interests. It also does not consider the claimant's noncompliance with treatment.

R. 838. There are multiple errors contained in this single paragraph. The errors completely negate the ALJ's reasons for failing to give controlling weight to this opinion.

First, the ALJ's statement that Dr. Siragavarapu's findings regarding Ms. Cordero's mental limitations were "not consistent with [her] routine and conservative treatment" is not supported by substantial evidence. It may be appropriate for a doctor or other qualified expert to form an opinion that one would expect to see a more aggressive treatment history for a medical issue. Such an opinion would be based upon the doctor's years of medical training and clinical experience, and it would enable him to form a general guideline about the relationship of aggressive treatment history and severity of the particular disorder. Such an opinion is often offered by an examining or consulting physician and can form the basis of an ALJ's determination that the level of treatment is not commensurate with the limitations identified by the treating physician. But the ALJ is not free to "go it alone." It is not permissible for an ALJ to arrive at such a conclusion, absent substantial support in the medical evidence in the record before him. Conservative treatment for a particular condition may mean that aggressive treatment does not offer much hope of success, or that more radical treatments don't exist, rather than indicate that the condition is mild. Botox injections and a diskectomy for migraines do not strike me as either routine or conservative. Neither does implantation of a vagus nerve stimulation device to assist with seizures. Or years of taking powerful psychotropic drugs that have profound side effects. If these are routine and conservative treatments, it would take a qualified specialist to say so.

As Ms. Cordero notes in her reply brief, suggesting that a given treatment for a mental impairment is "conservative" is particularly perilous. Pet. Rep. at 1, n.1. ("The history of brain surgery as a treatment for mental illness is not one the psychiatric community is proud of. *See Ethical Considerations of Psychosurgery: The unhappy Legacy of the pre-frontal Lobotomy*" (citation omitted)). Unlike a claimant who has

been treated for a mental impairment with only talk therapy, Ms. Cordero has been treated with countless doses of psychotropic medications in an effort to control her severe bipolar disorder, anxiety, and depression. The conclusion by this ALJ that Ms. Cordero's years of treatment with Dr. Siragavarapu were "routine and conservative" is not supported by substantial evidence. There is no support for this conclusion in the medical record, as the medical record sets forth years of treatment for Ms. Cordero's mental impairments without suggesting  whether the treatments are aggressive or conservative in nature. Therefore, the ALJ's first reason for rejecting the treating physician's opinion is legally invalid.

Second, the ALJ's record citation, ("[*s*]*ee e.g.*, Exhibits 9F, 14F, 19F and 20F"), without reference to specific page numbers, is unhelpful to me for purposes of review. For example, Exhibit 9F consists of 55 pages of psychiatric sessions/progress notes from Lehigh Valley Community Mental Health Center (LVCMHC), while Exhibit 14F consists of  56 pages of records from the same mental health facility. All of these records contain multiple findings, which supported the psychiatrists' continued prescriptions for psychotropic medications in an effort to alleviate Ms. Cordero's significant symptoms related to depression and bipolar disorder. Exhibits 19 and 20F consist of just eight pages of treatment records from LVCMHC between March 4, 2014 and April 12, 2014, and January 7, 2014 and April 17, 2014, respectively, (and appear to be two copies of the same four pages of records). While they do note that on March 4, 2014 and April 17, 2014, Ms. Cordero was appropriately dressed and cooperative, they also noted that she was depressed and anxious, with only fair insight and judgment (March 4, 2014); and she reported having had a seizure, while continuing to suffer from anxiety and depression (April 17, 2014). On both dates, Ms. Cordero was receiving psychotropic

medications including Lithium, Seroquel XR, and Buspar, as well as Ambien for sleep. R. 792-99. Thus, the records cited do not support the ALJ's conclusion—that the medical evidence does not support the treating doctor's opinion. In fact, they do.

Next, the ALJ writes that, "the doctor opined as to significant mental limitations while simultaneously opining the claimant could manage benefits in her own best interests." Ms. Cordero's counsel pointed out the incoherence of this statement in his detailed letter to the Appeals Council seeking their reversal of the ALJ's decision. R. 1061. Accepting the ALJ's statement on its face would mean that any individual entitled to benefits would need a legal representative to manage those benefits on the claimant's behalf. The Social Security Administration has no such requirement. The ability to balance a checkbook and handle one's finances does not necessarily correlate with the ability to handle full-time employment. Therefore, this statement provides no support for the ALJ's rejection of the treating doctor's opinion. The Social Security Administration's own regulations state as much.

> [T]he fact that you have done, or currently do, some routine activities without help or support does not necessarily mean that you do not have a mental disorder or that you are not disabled. For example, you may be able to take care of your personal needs, cook, shop, pay your bills, live by yourself, and drive a car. You may demonstrate both strengths and deficits in your daily functioning.

20 C.F.R. Pt. 404, Appendix 1 of Subpart P § 12.00(D)(3)(a). The Third Circuit has consistently maintained that evidence of an ability to perform some activities of daily living outside the stresses of a work environment will not override the opinion of treating doctors that a mental impairment is disabling in a work setting. *See Morales*, 225 F.3d at 319; *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not

mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

Evidence in this record verifies that Ms. Cordero cannot live by herself, had her driver's license revoked because of uncontrolled seizures, and needs assistance to perform personal needs like obtaining groceries and cooking. Using the doctor's suggestion that Ms. Cordero could "manage her own benefits" as a reason to deny those benefits was error, pursuant to the Administration's regulations. A claimant may be capable of some activities of daily living, without contradicting the opinion of a treating mental health specialist that she suffers from a work-preclusive mental impairment. *See Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008).[37] The ALJ's dismissive treatment of the subjective evidence presented by Ms. Cordero during her testimony, and in the third party report of Ms. Cordero's mother, exacerbated his error. Had the ALJ appropriately weighed this evidence of the severe limitations Ms. Cordero faces in her activities of daily living, he could not have used phrases such as "manages her own benefits," and "cares for herself," as a counter-weight to the medical evidence supplied

---

[37] While not precedential in the Third Circuit, the circumstances of the Seventh Circuit's decision in *Bauer* are strikingly similar to those presented here, making Judge Posner's words recommended reading:

> Many of the reasons offered by the administrative law judge for discounting the evidence of Drs. Caspary and Chucka suggest a lack of acquaintance with bipolar disorder. For example, the judge noted that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an "active participator [*sic*] in group therapy," is "independent in her personal hygiene," and takes care of her 13–year–old son. This is just to say that the plaintiff is not a raving maniac who needs to be locked up. She is heavily medicated, and this enables her to cope with the challenges of daily living, and would doubtless enable her to work on some days. But the administrative law judge disregarded uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the laundry, and helps with the grocery shopping. And Caspary and Chucka, having treated the plaintiff continuously for three years, have concluded that she cannot hold down a full-time job.

*Bauer v. Astrue*, 532 F.3d 606, 608–09 (7th Cir. 2008).

by Ms. Cordero's psychiatrists that her impairments severely affect her ability to handle full-time employment.

Finally, the ALJ uses his fall-back reason—that Ms. Cordero is "noncompliant" with her treatment as a reason to discount the opinion. Curiously, the records cited in the preceding sentence (exhibits 9F, 14F, 19F and 20F) indicate that Ms. Cordero *was* compliant with her medication, making a "noncompliance" notation by the ALJ at this juncture particularly puzzling. *See* R. 796, ("tolerating meds well"), and 798 ("compliant w/ meds"). Both quotes were handwritten notations made by Dr. Siragavarapu. Therefore, again on both a factual and legal basis, this final "reason" for failing to accept the opinion of Ms. Cordero's treating psychiatrist was error.

The ALJ provided not a single legitimate reason for giving "little weight" to Dr. Siravaragapu's opinion that Ms. Cordero suffered from a mental impairment that caused "marked" limitations in categories sufficient to support an award of benefits. The rejection of this treating specialist's opinion was error.

### iv. *Dr. Enrique Lirag*

The ALJ erred by dismissing the opinion of Dr. Enrique Lirag, Ms. Cordero's other treating psychiatrist, in several of the same ways as he erred in dismissing Dr. Siragavarapu's opinion.

Ms. Cordero first went to Haven House for psychiatric treatment on October 15, 2016, although she apparently did not begin to see Dr. Lirag until several months later. *See infra*. On October 15, she was interviewed by Lauren Higgins, MA, who prepared a detailed intake report. R. 1185-91. Ms. Cordero advised that she lived with her boyfriend of eleven years and her two children, ages 21 and 9. R. 1185. Her mother, who previously lived with her, passed away in 2015. *Id*. She reported becoming angry, causing her to

"slam[] things, yell[], and isolate[]. *Id*. Her anger sometimes caused her to "black-out"
but she reported she was now able to control herself better to avoid this extreme. Her
neurologist recommended that she return to psychiatric treatment, which she stopped
when LVCMH closed. *Id*. She reported epileptic seizures "a couple times a month," and
stated that she lost her driver's license due to the seizures. *Id*. Her sleep is
"inconsistent," causing her to "pace back and forth" during the night. *Id*. She denied
suicidal ideation but stated "that if her children were not around it would be better to
go." *Id*. She had not attempted suicide.  *Id*. She does not leave her home except when
"she has to." *Id*. Other than cigarettes, Ms. Cordero does not exhibit addictive behavior
and does not have any history of substance abuse. R. 1187.

Ms. Cordero first saw Dr. Lirag[38] on May 1, 2017. R. 1154. Dr. Lirag wrote a
complete report on this date, describing the then 37-year old's history of treatment,
obtained "from the patient, records from her PCP and neurologist, and also the Haven
House outpatient assessment." R. 1176. Ms. Cordero advised that she was formerly a
patient of Lehigh Valley Community Mental Health (LVCMH) [Dr. Siragavarapu] "until
they no longer accepted her insurance." *Id*. She then attended Bet-El Counseling
Services but was unhappy with her treatment there and she therefore stopped treatment
in early 2016. *Id*. In the interim, she continued to see her neurologist, who prescribed
sleep medications and anti-anxiety medications until she could find a new psychiatrist.
*Id*. She described manic episodes lasting three to five days when she is hyperactive and
cannot sleep, and depressive periods when "she isolates, can't sleep, is anhedonic, lacks
energy and desire to do things, just stays in her room, and has crying spells and self-

---

[38] Dr. Enrique Lirag, like Dr. Siragavarapu, is board-certified in psychiatry. https://www.haven-
house.com/mental-health-services/outpatient-enrique-lirag-md/.

deprecating thoughts." *Id*. Ms. Cordero advised that she began getting migraine headaches in elementary school. She sees a specialist for her migraines and a different specialist for her epilepsy. *Id*. at 1177. She has a vagal nerve stimulation device implanted to assist with her seizures. *Id*. In May 2017, her current medications were Sumatriptan, Lamictal 300 mg AM and Depakote, as well as a Ferrous Sulfate supplement. Her weight at that time was 145 pounds, down from a high of 220 pounds. *Id*.

Dr. Lirag's treatment recommendation after he took the above-described patient history read:

> This is a patient with epilepsy who is on two anticonvulsants that are also used for bipolar disorder, but she is still having a lot of mood swings and depression so we will give her a trial of Latuda at this time starting at 20 mg after dinner and titrate accordingly. I discussed the benefits and side effects of Latuda to include the potential for weight gain, metabolic syndrome, and abnormal involuntary movements. As far as her sleep, we will put her back on Ambien 10 mg h.s. PRN; no Trazodone yet. For anxiety she may continue Hydroxyzine that was prescribed by her neurologist and is to call me if she needs a higher dose. . . . follow-up in three weeks.

R. 1178.

Dr. Lirag's treatment notes are handwritten and frequently difficult to read, however, most of the notes that are readable indicate continued problems. For example, the notes from June 5, 2017 indicate that she was sleeping well at that time with the assistance of Ambien, but that her neurologist had stopped Klonopin because it was not working and switched her to Depakote, which caused her to suffer an increase in weight. R. 1184. Despite the change, she still was having seizures and her anxiety had increased. *Id*. The progress notes for July 14, 2017 indicate Ms. Cordero was having increased mood swings, and she needed Ambien to sleep. R. 1183. She stated that her main

36

concern at the time was her anxiety. *Id*. She advised of an increase in daytime sedation, but had no increase in appetite. *Id*. The doctor described her as "tired looking." *Id*.

The progress notes for November 11, 2017 note poor sleep lately due to Ms. Cordero having seizures. R. 1182. The dosage of an unintelligible drug was increased and a second drug (possibly phenobarbitol) was added. *Id*. Although "friendly" and "cooperative," Ms. Cordero was "tearful" during the visit. *Id*. Dr. Lirag increased Ms. Cordero's Latuda dosage and took other action which is unintelligible in the progress notes. *Id*.

The progress notes for January 19, 2018 indicate that Ms. Cordero had run out of her medications and was "not well," and noted that her brother recently committed suicide. R. 1181. The rest of the page is unintelligible. The progress notes from May 11, 2018 indicate that Ms. Cordero had transportation problems that caused her to miss an appointment. R. 1180. She was unable to tolerate Latuda due to GI upset. *Id*. Although Ms. Cordero was "friendly" and "cooperative," the doctor noted "leg shaking." *Id*. The progress notes for June 4, 2018 stated, "[s]he lost a lot of w[eigh]t, no appetite. 156 [to] 138 lbs in 1 ½ months." R. 1179. "Axis 3 (unintelligible) psychomotor retarded, tremors." *Id*. "(Unintelligible) ^ anxiety (unintelligible)." *Id*. A partially intelligible note indicates that Dr. Lirag increased Ms. Cordero's Vraylor dosage, but instructed her "don't take Ambien after Vraylar. If still not asleep after 1 hour, take Ambien." *Id*.

After treating Ms. Cordero monthly for over a year for her Bipolar II disorder and generalized anxiety disorder, Dr. Lirag completed a psychiatric/psychological impairment questionnaire on July 2, 2018. R. 1193. Dr. Lirag, like previous treating psychiatrist Dr. Siravaragapu, found that Ms. Cordero exhibited clinical signs and symptoms of (1) appetite disturbance with weight change; (2) feelings of

guilt/worthlessness; (3) generalized persistent anxiety; and (4) decreased energy. Additionally, Dr. Lirag found Ms. Cordero suffered from a depressed mood, manic syndrome, difficulty thinking or concentrating, easy distractibility, anhedonia/pervasive loss of interest, motor tension, psychomotor retardation, and sleep disturbances. R. 1194. He noted that Ms. Cordero received no significant improvement in her symptoms even on a high dose of Klonopin, and she continued to suffer from symptoms of severe anxiety, chronic tension, tremulousness with constant leg shaking, an inability to think straight, forgetfulness, and depression. R. 1195.

Dr. Lirag also specifically stated that Ms. Cordero was not a malingerer and had likely suffered from her symptoms since she was approximately 27 years old.[39] R. 1193. He diagnosed her with Bipolar II disorder and generalized anxiety disorder pursuant to a DSM-5 evaluation, with psychosocial factors of multiple family stressors and health issues. *Id.* Her medications on the date the questionnaire was completed were Vraylar, Klonopin, Lamictal, phenobarbital, and Ambien. *Id.*

Similar to Dr. Siragavarapu, Dr. Lirag found Ms. Cordero had "marked limitations" in the following areas:

(1) Understanding and memory:
- The ability to remember locations and work-like procedures.
- The ability to understand and remember one or two step instructions.
- The ability to understand and remember detailed instructions.

(2) Sustained concentration and persistence:
- The ability to carry out detailed instructions.
- The ability to maintain attention and concentration for extended periods.
- The ability to work in coordination with or proximity to others without being distracted by them.
- The ability to complete a workday without interruptions from psychological symptoms

---

[39] Ms. Cordero would have been 38 on the date the report was prepared.

- The ability to perform at a consistent pace without rest periods of unreasonable length or frequency.

(3) Social interactions:

- The ability to interact appropriately with the general public.

Dr. Lirag found Ms. Cordero exhibited "moderate to marked limitations" in several additional categories.[40] With regard to "adaptation," Dr. Lirag found that Ms. Cordero had moderate degrees of limitation in all four categories.[41] R. 1197. Dr. Lirag estimated her symptoms would cause Ms. Cordero to miss work more than three times per month and opined that she had suffered from her impairments since age 27. R. 1198.

Approximately six months later, Dr. Lirag completed the same impairment questionnaire a second time, on February 20, 2019, and noted that Ms. Cordero's treatment sessions were less frequent at every eight weeks. R. 1248. Her diagnosis remained the same, Bipolar II disorder and generalized anxiety disorder. *Id.* His estimate of the number of days Ms. Cordero would miss from work due to her symptoms remained at more than three times per month, and he continued to believe that "the available clinical and objective findings detailed in the questionnaire [were] reasonably

---

[40] Those categories are:

    (2) Sustained concentration and persistence:

- The ability to carry out simple instructions.
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.
- The ability to sustain an ordinary routine without supervision.
- The ability to make simple work-related decisions.

    (3) Social interactions:

- The ability to accept instructions and respond appropriately to criticism from supervisors.

[41] The adaptation categories are:

    (4) Adaptation:

- The ability to respond appropriately to workplace changes.
- The ability to be aware of normal hazards and take appropriate precautions.
- The ability to travel to unfamiliar places or use public transportation.
- The ability to set realistic goals or make plans independently.

consistent with [the] patient's symptoms and functional limitations." R. 1198, 1252. A function-by-function comparison of the two forms shows that Ms. Cordero displayed some improvement by February 2019 in social interactions and her ability to adapt to the workplace, exhibiting none-to-mild limitations in her ability to respond appropriately to criticism from supervisors, maintain socially appropriate behavior, adhere to basic standards of neatness, set realistic goals and make plans independently. R. 1251.

Nevertheless, Dr. Lirag believed Ms. Cordero continued to have marked limitations in remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; making simple work-related decisions; completing a workday without interruptions from psychological symptoms; and performing at a consistent pace without rest periods of unreasonable length or frequency. *Id.*

The ALJ dismissed all of Dr. Lirag's treatment records and analyses in both opinion forms in a few sentences:

> The undersigned gives little weight to these opinions. These opinions are about 7 months apart and the records fail to show a severe worsening of her impairments. There is no reasonable explanation from the record concerning the changes between the two opinions. She also continued to have periods of noncompliance.

R. 840.

As noted by Ms. Cordero in her initial brief, the medical records support all of the findings of the two treating psychiatrists. Pl. Br. at 10. The Plaintiff cites to dozens of locations in the record that confirm the two doctors' findings that Ms. Cordero suffers

from all of the abnormalities associated with her bipolar, depression, and anxiety disorders, including: appetite disturbance, sleep disturbance, mood abnormalities, lability and mood swings, panic attacks, decreased energy or motivation, irritability, manic symptoms, abnormal thinking or concentration, loss of interest, psychomotor abnormalities and restlessness. (Citations to the record omitted). *Id.*

The rejection of Dr. Lirag's opinion is even less defensible than the rejection of Dr. Siravaragapu's opinion. Other than noncompliance, the ALJ's only stated reason for rejecting the opinions of Dr. Lirag were that his two opinion forms differed in some respects with no specific reasons described by the doctor, and no indication that Ms. Cordero's condition severely worsened. R. 840. But there is no requirement that a doctor make such a finding of deterioration to support an award of benefits. As argued by Ms. Cordero in her initial brief, fluctuation in symptoms over time is not unusual in the longitudinal treatment of bipolar disorder, and neither opinion is inconsistent with the supporting medical records. Pl. Br. at 15. Therefore, this reason for the rejection of the treating specialist's opinion is based solely on the ALJ's lay opinion.

Ms. Cordero argues in her brief that the ALJ improperly rejected these two treating psychiatrists' well-supported opinions, giving more weight to doctors who, in some instances, never examined Ms. Cordero. Pl. Br. pp. 8-21. She correctly argues that the Social Security regulations require an ALJ who fails to accept a well-supported medical opinion by a treating physician, must take into account that physician's examining relationship, the treatment relationship, supportability, consistency, and specialization. Pl. Br. at 9, citing 20 C.F.R. § 404.1527(c)(2)-(6) and § 416.927(c)(2)-(6).

I agree that the ALJ did not address any of these categories with respect to either of these board-certified psychiatrists, who both personally treated the Plaintiff for at

least two years, and whose records in each instance supported the opinion, when read as a whole. Instead, the ALJ substituted his own lay opinion of the medical evidence, repeatedly relying on "noncompliance" as a reason to reject the opinions of these qualified physicians. This error is particularly striking, given that the remand from the district court specifically instructed the ALJ to comply with these regulations when assessing the treating physicians' reports.

While the Commissioner is correct that an ALJ is not categorically obligated to accept a medical expert's testimony, the ALJ here committed reversible error by relying on his own lay opinion to reject the medical evidence supporting the medical experts' opinions, and failing to take into consideration both psychiatrists' examining relationship, treatment relationship, supportability, consistency, and specialization. Indeed, although the ALJ repeatedly stated that the doctors' opinions were "inconsistent with the record as previously discussed," the longitudinal records of her treating specialists were remarkably consistent over time, and my review of the entire opinion fails to turn up either a helpful discussion by the ALJ of the "inconsistent records" that support his finding, or citation to medical records that document such differences.

A treating physician's opinion may be rejected if there is contradictory medical evidence, *Plummer*, 186 F.3d at 429, if there is insufficient clinical data to support it, *see Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985), or if the opinion is contradicted by the physician's own treating notes or the patient's activities of daily living, *see Smith v. Astrue*, 359 F. App'x 313, 316–17 (3d Cir. 2009) (not precedential). On the other hand, the ALJ is not permitted to make speculative inferences from medical reports or "employ her own expertise against that of a physician who presents competent medical evidence." *Plummer*, 186 F.3d at 429. If an ALJ decides to reject medical opinion

evidence, he may not do so for "no reason or for the wrong reason." *Id.* (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). When weighing medical opinion evidence, an ALJ may consider the claimant's daily living activities, such as childcare. *See Rae v. Berryhill*, No. 17-967, 2018 WL 3619247, at *5 n.7 (W.D. Pa. July 30, 2018); *Gonzales v. Colvin*, 191 F. Supp. 3d 401, 423–25 (M.D. Pa. 2015) (discussing at length case law regarding the appropriate use of activities of daily living evidence, particularly in the context of childcare).

The ALJ used the Plaintiff's apparent ability to care for her child as one of the reasons to discount both the subjective evidence presented by the Plaintiff and the doctors' expert opinions. *See* R. 833 (rejecting the Plaintiff's testimony with regard to the limitations caused by her impairments), "[A]s indicated by the above medical records, when she is complaint (sic) with treatment, her impairments are well controlled. She also cares for herself and her child;" 835 (rejecting the opinion of Dr. Malik) "[s]he also cares for herself and her child. She performs regular tasks at home." The Commissioner argued that this reasoning on the part of the ALJ provided a legitimate reason to accept his rejection of Dr. Malik's opinion with regard to the effects of Ms. Cordero's debilitating migraines on her ability to handle full-time employment. Comm. Resp. at 12 ("The ALJ additionally cited Plaintiff's demonstrated ability to provide care for herself and her school-aged child, and regularly perform household chores.")

The ability to care for one's children may be used "to discount credibility if it contradicts a claimant's limitations or symptoms." *Gonzales*, 191 F. Supp. 3d at 425; *see also Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005) (concluding that the ALJ's decision to discount claimed side effects of drowsiness based on inconsistencies in

the record, including testimony that claimant cared for her child and grandchild, was supported by substantial evidence). However, "[t]he ability to care for children, alone, does not inherently indicate that a claimant possesses the ability to perform on a regular and continuing basis in a work setting." *Gonzales*, 191 F. Supp. 3d at 424; *see also Rae*, 2018 WL 3619247, at *5 n.7 ("Although it is not improper for an ALJ to consider reported activities of daily living in assessing credibility, it likewise is well-established that the ability to perform activities of daily living does not always correspond with the ability to carry out sustained work-related mental activities in a work setting on a regular and continuing basis."). It is unclear how the fact that Ms. Cordero lives with her 23 year-old niece and 11 year-old daughter, for whom she provides some care, supports the ALJ's rejection of Drs. Siravaragapu's and Lirag's findings that Ms. Cordero has marked limitations in her ability to remember and follow even simple instructions, interact with coworkers, or even travel regularly to a jobsite. Caring for one's own children is not substantial evidence of one's ability to handle full-time employment. The work environment and dynamic among colleagues significantly differ from the environment and dynamic with one's children or partner. Therefore, the ALJ's reliance on Ms. Cordero's family dynamic again failed to support his rejection of medical opinion evidence with an adequate explanation.

Drs. Siragavarapu and Lirag are both licensed psychiatrists, an accepted source of medical opinion evidence, and both treated Ms. Cordero for extended periods of time. To accept the testimony of Dr. Cohen, discussed *infra* at 52-6, over these two treating psychiatrists, as is argued by the Commissioner, is simply wrong on this record. Dr. Cohen was not privy to years of consistent medical evidence, and his testimony was, at best, factually inaccurate. Likewise, the ALJ's suggestion that Ms. Cordero functions

well on her own is wholly belied by the record as a whole, which supports Ms. Cordero's contention that she relies heavily on her family for support, handles activities of daily living only sporadically, and is often not able to leave her own darkened bedroom. These well-documented circumstances do not support a finding that the Plaintiff would be capable of leaving her home to travel to even an unskilled, sedentary, full-time job.

For these reasons, the ALJ's decision is legally flawed and not supported by substantial evidence.

### b. Consulting Physicians.

#### i. Dr. Thomas Lane.

Thomas W. Lane, Ph.D., a licensed psychologist, conducted a psychological evaluation on May 19, 2011. Of note in Dr. Lane's report was a finding that Ms. Cordero could remember zero of three items after 45 minutes, R. 582, and she endorsed a labile mood with considerable depression and irritability when describing her psychiatric history. R. 581. She reported experiencing anxiety throughout the day, as well as forgetfulness and confusion. She also reported insomnia and pacing at night. *Id.* Ms. Cordero appeared obese but reported a weight loss of 60 pounds during the previous year. R. 581. Dr. Lane estimated her GAF Score on that date to be 45. R. 582. Dr. Lane described her judgment and insight as only "fair." *Id.*

Dr. Lane opined that Ms. Cordero had marked limitations in her ability to carry out detailed instructions, responding appropriately to work pressures in a usual work setting and responding appropriately to changes in a routine work setting. R. 585. He rated Ms. Cordero as having a moderate limitation in every other rating category: understand and remember short, simple instructions; carry out short, simple instructions, understand and remember detailed instructions, make judgments on

simple work-related decisions; interact appropriately with the public; interact appropriately with supervisors, and interact appropriately with co-workers. *Id*. Dr. Lane supported his conclusions with medical findings including increased forgetfulness and confusion following onset of a seizure disorder in January 2011; poor short-term memory; acute bouts of anxiety experienced on a daily basis, secondary to a mood disturbance and panic without agoraphobia, and increased worry associated with managing her recently-diagnosed seizure disorder. *Id*.

The ALJ gave Dr. Lane's findings partial weight, finding the "opinion is based on a one-time interaction without the benefit of any meaningful record review." R. 836. The ALJ specifically found that the "marked" limitation findings were "inconsistent with the record as a whole as previously discussed. Her treatment records do not document such severe limitations." R. 837.  The ALJ's conclusion essentially points to 2,000 pages of record and says the "marked" limitations are inconsistent with the records. The added phrase "as previously discussed" is no more helpful. The ALJ's opinion is a catalog of severe illness with a batch of conclusory "noncompliance" findings thrown  in, untethered from the requirements of the regulations. If the ALJ's conclusion is based on something other than his finding of "noncompliance," I have not been able to find it in the record. The record is certainly not "inconsistent" with marked limitations. I find the ALJ's decision does not permit meaningful review. If the ALJ's finding is based predominantly on his "noncompliance" mantra, which I suspect it is, then it is error, and harmful, for the reasons I have explained.

> ### ii. Dr. Sherman.

On August 23, 2018 Ronald Sherman, Ph.D. conducted a consultative psychological evaluation at the request of Ms. Cordero's counsel. R. 1199-1212. Dr.

Sherman reviewed Plaintiff's chart prior to the evaluation, and after interviewing her, Dr. Sherman diagnosed Ms. Cordero with bipolar disorder (unspecified), generalized anxiety disorder, and obsessive-compulsive characteristics. He opined her current GAF score was 45. He completed a check-box form in which he opined her limitations were "marked" in a total of 18 separate categories, including almost every category under "concentration and persistence," "social interactions," and "adaptation." R. 1208. He opined that she would be unable to maintain employment, and would miss work more than three days per month due to her psychological symptoms. R. 1209. Although the ALJ discussed Dr. Sherman's consultative examination and opinion at R. 828, he did not discuss what weight he gave the opinion.  This was error.

### iii. Dr. Nader.[42]

Dr. Joseph Nader, M.D. performed a Disability examination on May 25, 2011. R. 588-92. Dr. Nader was a cardiologist in Allentown, Pennsylvania (he died on February 2, 2021) affiliated with St. Luke's Hospital. [43] Dr. Nader opined that Ms. Cordero's prognosis was "fair," and that she suffered from (1) seizure disorder that appears stable; (2) migraine headaches; (3) personality changes with bipolar depression; and (4) chronic low back pain. R. 591. He recommended that she continue with Keppra 500 mg twice daily, continue taking Zoloft and attend psychiatric counseling, and have an x-ray of her lumbar spine. R. 592.

---

[42] Dr. Nader's conclusions were geared toward Ms. Cordero's physical, rather than mental, limitations, and are included here for the limited purpose of demonstrating the ALJ's decision not to give *any* physician's opinion more than passing consideration.

[43] *See* https://www.healthgrades.com/physician/dr-joseph-nader-3f6xn.

Dr. Nader opined that given her back pain, Ms. Cordero would be limited to standing and walking for one hour or less in an eight-hour workday and sitting less than six hours. R. 593. He limited her frequent lifting and carrying to 2-3 pounds. *Id.*

The ALJ gave little weight to Dr. Nader's opinion, finding that the limitations he suggested were necessary in Ms. Cordero's ability to lift and carry objects, her postural limitations, and suggested limitations on her ability to work around moving machinery, vibration, and temperature extremes, were "not consistent with the record as a whole as previously discussed" and were "internally inconsistent," in that "even the claimant admitted at the hearing she is capable of some cooking, chores, watching TV, and that she spends her day pacing around." R. 833-34. Cooking, home chores, and watching TV is not the same as working. As for the catch phrase "not consistent with the record as a whole as previously discussed," the phrase is a label, not analysis, and does not permit meaningful review, for reasons discussed above.

*iv. Thomas Fink, Ph.D. and James Vizza, Psy.D.*

Two state agency reviewing psychologists provided opinions in 2011, Dr. Fink in June and Dr. Vizza in August. The fact that the reports were rendered in 2011 means they have little or no value when it comes to weighing the treating psychiatric or neurologic evidence between 2011 and 2019. The ALJ discussed their reports at R. 837.

Dr. Fink opined that Ms. Cordero suffered from severe anxiety and affective disorder, but could perform "simple work." The ALJ gave Dr. Fink's opinion "partial weight" as it was "generally consistent with [the] record as a whole," but the record now contained additional records not reviewed by Dr. Fink, and "the mental health listings have been since updated." *Id.* Similarly, Dr. Vizza, who provided two reports, the first in August 2011 and the second a year later in August 2012, found Ms. Cordero suffered

48

from severe anxiety and affective disorder, but had only moderate limitations in several categories, and could perform simple work. The ALJ gave the same "partial weight" to Dr. Vizza's two opinions, for the same reasons, acknowledging the years of additional records and the change in the mental health listings since the reports were written. *Id.*

### v. Drs. Waldron, Bermudez, and Hutsko.

Three additional state agency consultations were made part of the file prior to the first hearing and prior to the first opinion's issuance. Theodore Waldron, D.O. examined Ms. Cordero in June 2011. He opined that Ms. Cordero could perform light work with certain limitations. The ALJ gave this opinion "partial weight," but stated that "additional records have been received into evidence since the opinion was rendered. For example, the claimant's seizure disorder warrants greater hazard precautions than that opined by the doctor." R. 834.

Dr. Minda Bermudez, M.D., examined Ms. Cordero for the state agency in September 2011. She opined that Ms. Cordero could perform medium work while abiding by "the standard seizure precautions." The ALJ again gave the state agency consultant's opinion "partial weight," and gave as his reason:

> It is broadly consistent with the records but not entirely consistent with the record as a whole as previously discussed because additional records have been received into evidence since the opinion was rendered. For example, the doctor's opinion on hazard precutions is supported but the exertional limitations are not.

*Id.*

Finally, the ALJ detailed Dr. Joseph Hutsko's consultative examination on November 8, 2012, during which Ms. Cordero detailed her seizure activity to that point R. 823. (Ms. Cordero experienced only one verified seizure in 2010 until they returned in 2014, *see* records of Dr. Lim, R. 1125). She described migraine headaches which

49

occurred up to five times per week, with visual aura and left side pain and numbness. *Id.* Dr. Hutsko provided a detailed list of work conditions that would apply to Ms. Cordero, and the ALJ gave the opinion "partial weight." R. 834. His reasons for limiting the opinion's weight to partial included that it was based on a one-time interaction, and was "only partially consistent with the record as a whole as previously discussed and the doctor's own examination." *Id.*

### c.  *Ms. Cordero's other Hospitalizations and Medication History.*[44]

Nothing in Ms. Cordero's other hospitalizations and medication history is consistent with the opinions of the four treating physicians.

On January 13, 2011, Ms. Cordero was admitted to the hospital via the emergency room after her husband witnessed a nocturnal seizure at approximately 6:00 a.m. R. 548. She was given intravenous Solu-Medrol, Robaxin and Compazine for a severe headache, which did resolve with these IV medications. R. 549. She was told to avoid the large dosages of Aleve that she had been using in an attempt to relieve her severe headaches, but was not given prescriptions for any medications—instead she was advised to seek assistance from her primary care physician.[45]

---

[44] This recitation is not a complete listing of all of Ms. Cordero's trips to the hospital, or all of her medications. The records for St. Luke's Hospital span more than 800 pages, and what follows is a summary of a few of the instances in which Ms. Cordero required medical treatment above and beyond that provided by her treating specialists.

[45] It does not appear that Ms. Cordero received any such assistance from her primary physician, however. Handwritten records with an unintelligible signature dated January 19, 2011 are contained in the record at Exhibit 4F, pp. 560-61, which are listed as "[t]reating records, dated 01/19/2011 to 03/10/2011 from LVPG Allentown Medical Associates." They discuss both Ms. Cordero's headaches and seizures, indicate that Ms. Cordero failed to bring her hospital stay records with her, and with regard to medications indicate only, "continue Keppra until sees neurology." Other than a note that appears to state that Ms. Cordero would be given a Naproxen injection there is no indication that she was given any prescriptions for her chronic headaches. "LVPG" stands for "Lehigh Valley Physician Group, which is a part of the Lehigh Valley Health Network, and is a primary care physician's office. *See* https://www.lvhn.org/about-us/lehigh-valley-physician-group-lvpg.

On January 20, 2011, records from Lehigh Magnetic Imaging Center, who performed a brain MRI and EEG on that date, listed her medications as Keppra, Compazine and Robaxin. R. 512. This does not appear to be a complete list of medications. (The report states, "other medicines include . . ."). *Id*. Records from St. Luke's Neurological Associates signed by Christen F. Kutz, MS and Bushra I. Malik, M.D., list new medications as Keppra 500 mg, Anaprox DS 550 mg, Flexeril 10 mg, Magnesium 250 mg, Riboflavin 100 mg, and Levetiracetam 500 mg. Dosages of each medication appear to be different with the single exception of Magnesium and Levetiracetam, both of which are to be taken "1 po bid." R. 510.

A "Patient Medication Discharge Report" dated March 21, 2011 from St. Luke's Hospital[46] list Ms. Cordero's medications as:

Flexeril – 10 mg – Every 8 hours as needed.
Gabapentin – 100 mg – Daily.
Keppra – 500 mg – Every morning.
Keppra – 1,000 mg – Every evening.
Magnesium – 250 mg – 2 times per day.
Naproxen – 550 mg – Every 12 hours as needed.

R. 572.

A medication list dated May 14, 2014, (approximately the same time-frame as the medical opinion of Dr. Siragavarapu in March 2014) from St. Luke Neurology Associates, Dr. Nancy Diaz, M.D., lists Ms. Cordero as also being prescribed, at various times: Abilify (Aripiprazole), Benztropine Mesylate (Cogentin), Clonazepam (Klonopin), Colace, Cyclobenzaprine HCl (Flexeril), Dicyclomine HCl (Bentyl), Gabapentin, Geodon, Hydroxyzine Pamoate (Vistaril), Levetiracetam (Keppra), Methocarbamol (Robaxin),

---

[46] Ms. Cordero went to St. Luke's Hospital on this date for chest pain. R. 574-79.

Naproxen, Naproxen Sodium, Prilosec OTC, Prochlorperazine Maleate (Compazine), Propranolol HCl (Inderal), and one final drug which could not be read due to the poor quality of the copy. R. 791. Although marked as "1 of 2" pages, just the first page is in the record at 791. Each of these medications were started between January and August of 2011.

Ms. Cordero was admitted to St. Luke's Hospital through the emergency room on November 14, 2016 with severe abdominal pain. Testing revealed a ureteral stone. R. 1308. Upon admission, she underwent a surgical procedure to remove the stone which was 7mm in diameter. R. 1323-24.

Her discharge medication list as of November 16, 2016 documented that she was started on ciprofloxacin (Cipro) 500 mg every twelve hours for five days, and tamsulosin (Flomax) once per day at dinner for 30 days. These were to be added to her current medications of: Lamotrigine ER 250 mg, (take 500 mg daily "until discontinued"); Olanzapine (Zyprexa) 2.5 mg daily "as needed;" Topiramate ER (Qudexy XR) 150 mg twice per day "until discontinued;" Iron polysaccharides (Niferex) 150 mg daily "until discontinued;" and Onabotulinumtoxin A (Botox) 100 units by infiltration route once every three months. R. 1305.

Six weeks later, on December 31, 2016, Ms. Cordero was again brought to St. Luke's Hospital in Bethlehem via ambulance with severe left-side abdominal pain. R. 1445. She was diagnosed with a kidney stone. R. 1449, 1452. Naproxen 500 mg (Naprosyn) twice daily with meals, ondansetron 4 mg (Zofran-ODT), every eight hours for nausea, and oxycodone-acetaminophen 5-325 mg (Percocet) for pain, were all added to her drug regimen upon discharge. R. 1485.

### d. *Dr. Cohen, Testifying Expert.*

ALJ Hoback continued to rely upon the testimony of Luka Cohen, Ph.D., from the first administrative hearing in June 2016, giving his testimony "partial weight." *See* R. 839. According to the Commissioner's responsive brief, Dr. Cohen provided the only medical evidence relied upon by ALJ Hoback to counter the rejection of Ms. Cordero's four treating specialists' opinions. Com. Resp. at 4-5. ALJ De Bernardis, the ALJ who heard Ms. Cordero's case the first time, called Dr. Cohen himself to testify as a medical expert. Because the second ALJ continued to rely on this testimony, despite the fact that Dr. Cohen did not testify at the second hearing, nor opine on any of the hundreds of pages of medical records that became part of the record between the first and second hearing, Dr. Cohen's testimony warrants brief discussion here.

Dr. Cohen testified that, based only on his review of the record, Ms. Cordero "has a bipolar disorder that would be potentially reversible with medication and she refused to take [the medication]." R. 52. The doctor insisted that Ms. Cordero "refused" to take Abilify, Risperdal, and Depakote, and that she had been "noncompliant." *Id*. He also testified that Ms. Cordero had taken "diet pills" and more Xanax than prescribed, making her "volitionally noncompliant with her treatment." R. 53. He testified that she was "mildly impaired," based on the fact that: "she dusts; she shops, she cleans; she drives a car up until at least May." *Id*.[47] Dr. Cohen further opined that Ms. Cordero had a moderate impairment in concentration, persistence and pace, again based in part on the fact that "until recently" she could drive a car, which requires "a great deal of

---

[47] The evidence is undisputed that Ms. Cordero lost her driver's license as a result of her epileptic seizures prior to the first hearing, and she has never been able to regain the license, as the seizures have never been completely controlled.

concentration." *Id.* Dr. Cohen stated that Ms. Cordero had a "moderate impairment overall," and that the "medical records are contradictory." *Id.*[48] When Ms. Cordero attempted to respond by stating that she "had not took (sic) Xanax in years," she was ignored by the ALJ. *Id.*

Upon questioning by Ms. Cordero's attorney, who pointed out that the treating psychiatrist had opined Ms. Cordero had a very low GAF score and "marked" difficulties in a number of categories, Dr. Cohen's response was:

> Well, she only diagnosed her with a mood disorder which is potentially first—that's even diagnosed with a bipolar disorder, panic attacks. I can tell you I did some of the original research with Dr. Volpe (phonetic) in the '70's on panic disorder, and it's potentially reversible with the correct treatment. She doesn't take her medications properly . . .

R. 54. At this point, Dr. Cohen was again interrupted by Ms. Cordero, stating, "yes, I do, I take my medications, . . ." and her attorney advised her to not interrupt the proceedings. R. 55. When the attorney pointed out to Dr. Cohen that there were "a couple of items that, at times, that you cited . . . where there was . . . noncompliance," Dr. Cohen again disagreed, without citation to the record, that "it's global noncompliance with treatment," citing refusal to take Abilify and Depakote, prompting a frustrated Ms. Cordero to again interrupt and state that she did, in fact, take Abilify, but it was stopped "because it wasn't working." *Id.* The doctor responded that Ms. Cordero "abused her Xanax and abused diet pills," at which point the attorney attempted to regain control of the proceeding by stating, "[a]ll right, all right, and nevertheless, though, that in the psychiatric and psychological impairment questionnaire that the

---

[48] This statement was made dismissively and Dr. Cohen did not cite to any evidence in the record to support the statement.

Claimant's treating psychiatrist also opined very similarly to the consultative examiner, in fact, with additional marked limitations . . .". R. 55-56.

Although it appeared that Dr. Cohen had not read the report in question, he nevertheless dismissed its lack of any indication that Ms. Cordero was noncompliant with her treatment by saying, "well, it's in the treatment record. It [the opinion form] doesn't ask the question." R. 57. After some continued back-and-forth between the attorney and Dr. Cohen, in which the attorney pointed out that apparently Dr. Cohen had not read several of the available pages of record, the attorney ended her questioning by asking, "I'm curious Dr. Cohen, as to how the Claimant's treating psychiatrist would conclude the complete opposite of you and," but was unable to finish her question, as she was cut off by Dr. Cohen's stating, "I don't know that. All I know is I'm reading the records as a whole and there's no marked functional limitations as I told you." R. 58. The attorney gave up her questioning, and the ALJ asked whether Dr. Cohen had seen "any explanation in 16F [the treating psychiatrist's opinion form] for any of the checkmarks to (inaudible)?" to which Dr. Cohen responded, "[n]o, they didn't explain things. They just checked." R. 59.

It is rare to see such a contentious transcript in a Social Security Administrative proceeding, which are non-adversarial by design. ALJ's are tasked with assuring that the record has the most complete collection of evidence concerning a claimant's asserted impairments as possible. "An ALJ's principal responsibilities are to hold full and fair hearings and to issue legally sufficient and defensible decisions." HALLEX I-2-0-5. (Hearing Office Chief Administrative Law Judge, Administrative Law Judge, and Hearing Office Staff Responsibilities). Despite this transcript revealing that the testifying "medical expert" had neither read all of the available records, (and, obviously,

would not have been privy to the several years of medical records documenting Ms. Cordero's treatment between the first and second hearings) nor did he appear particularly interested in taking all of them into account, ALJ Hoback mentions this testimony at several points throughout his opinion, which was written some four years after Dr. Cohen testified. The ALJ appears to use it as the sole example of his repeated reference to "inconsisten[cy] with the record as a whole," and "noncompliance," in his rejection of all of Ms. Cordero's treating specialists.

ALJ Hoback said of Dr. Cohen's testimony, "[t]he undersigned gives partial weight to this opinion. Dr. Cohen did not review all the records prior to the hearing then available and additional records have been received since the doctor testified including an update to the mental health listings." R. 839. The Commissioner argues that it is ALJ Hoback's adoption of this opinion testimony by Dr. Cohen in the first hearing, over that of Ms. Cordero's two treating psychiatrists, that justifies my acceptance of the ALJ's opinion in *toto*. Com. Resp. at 4 ("The ALJ appropriately declined to adopt the respective opinion evidence from Plaintiff's treating psychiatrists, Raghavendra Siragavarapu, M.D., and Enrique Lirag, M.D., whose extreme assessments comported with a finding of Social Security Disability, and permissibly granted more weight to the opinion of psychiatrist Luka W. Cohen, M.D. (sic), the medical expert who testified at the hearing.").

As noted in the Plaintiff's opening brief, Doc. No. 16, p. 16, "Dr. Cohen had not reviewed *any* of Plaintiff's psychiatric treatment records after July 2012, *seven years* prior to the ALJ decision at issue in this appeal." (Emphasis in original). Nevertheless, ALJ Hoback cited to Dr. Cohen's conclusions as a basis for rejecting the opinions of Ms. Cordero's treating specialists as "not consistent with the record as a whole," a phrase the

ALJ uses six times, always to suggest that the treating or consulting doctor in question was incorrect in his or her opinion that Ms. Cordero suffers from a particular medical issue. Despite the frequent use of the label "inconsistent," the ALJ never actually cites to the location in the record that is "inconsistent" with the (remarkably consistent) medical opinions of the treating physicians. *See e.g.*, R. 833, 834, 835, 837, 838, 840.

My review of the record emphatically contradicts the notion that the treating physicians' opinions are inconsistent with the record, in whole or in part, and the notion that Ms. Cordero was noncompliant with her medications. Virtually every doctor who examined Ms. Cordero, whether treating or consulting, found her medical impairments to be severe and work-preclusive. It is only the combative and dismissive testimony of Dr. Cohen, apparently based upon his research into panic disorders from fifty years ago, that the Commissioner cites as the counterweight to the years of medical evidence backing up the detailed opinions of Ms. Cordero's doctors that she suffers from a host of work-preclusive medical maladies.

The ALJ's assessment of the medical opinion evidence with respect to Ms. Cordero's mental impairments was erroneous.

### 3. *The ALJ improperly handled Plaintiff's subjective evidence.*

Like her treating physicians' records and opinions, Ms. Cordero's own reporting of her ongoing health struggles have been consistent through the years. On February 15, 2011, Ms. Cordero filled out a "New Patient Neurologic History and Physical" form in which she was asked to check on a form "problems that you are experiencing now." R. 543. Ms. Cordero stated that she had issues with (1) appetite; (2) nausea and vomiting; (3) head/neck/back pain; (4) anxiety and mood swings; (5) neurological symptoms of: headache with nausea/vomiting, lightheadedness, seizures, flashing lights, snoring, and

awakening at night; (6) mental status symptoms of: confusion and memory problems; (7) numbness and weakness in her face; (8) other muscle weakness, pain and tingling. *Id*. She was given injections of Compazine and Toradol on that date. R. 545. Ms. Cordero advised that she had returned to taking Aleve after leaving the hospital, having run out of the medications she was given while in the hospital. R. 549. Although she denied having any seizures that she knew of after being placed on Keppra, she recalled episodes of confusion, memory loss, and staring spells over the past several months. *Id*. Ms. Cordero was suffering from a severe headache at the time of her examination. R. 550. Her Keppra dosage was doubled and the comments state that she was told to discontinue Aleve and "try Flexeril 10 mg q8hrs and/or anaprox 550 mg q12 hours as needed for pain," and she was told to keep a "headache diary." *Id*.

Ms. Cordero testified at the April 11, 2019 hearing that she lives with her 23 year old niece, (who was raised by Ms. Cordero's mother and herself in her home), her 11-year old daughter, and her 88 year old grandfather. R. 863-64. An aunt comes to the house every day to assist her and her grandfather. She lost her driver's license "six years ago" and never got it back because of her epileptic seizures. R. 865. She told the ALJ that her seizures come without warning, and have caused her to hurt herself several times. R. 871. She does not leave the house because of her seizures. *Id*. Her migraine headaches last multiple days at a time and neither narcotics or "regular pills" relieve them. R. 871-72.

Ms. Cordero does not cook beyond heating soup or a frozen meal in the microwave or oven, her daughter does the cooking. R. 872. She handles housekeeping chores like sweeping and making the bed "little by little." R. 873. She does not take out the trash, cut grass, or shovel snow. *Id*. She does not do the grocery shopping, her

daughter orders the groceries on line and picks them up.[49] She suffers from panic attacks in stores so she does not go unless absolutely necessary, and she does not attend religious services or visit family or friends. R. 874. She has no patience to watch a movie or read books but she watches other television. R. 874-75. She does not use social media but occasionally talks on the phone. R. 876-77. She passes the time at home by "pacing." R. 877. She has dogs but does not exercise them as she simply lets them into her "big yard." R. 878.

In response to her attorney's questioning, Ms. Cordero described her seizures, which she estimated occurred four or five times per month, the last being the day before the hearing. R. 878. Her seizures frequently trigger headaches, and cause her to be confused or fall and hurt herself. R. 879. The medication she takes for the seizures, lamotrigine and phenobarbitol, cause kidney stones as a side effect. R. 880.

Ms. Cordero receives Botox injections every three months and takes preventive medications in an effort to stop her migraine headaches, without success. R. 883-84. A bad migraine causes her to vomit all day, she is unable to eat and must retreat to a dark room. They can last two to three days, and she has them three to four times per month. R. 884-85.

Ms. Cordero's psychological symptoms include paranoia that keeps her from being around other people or even leaving the house. R. 886. She experiences anxiety in the form of sweating and pacing. R. 887. Treatment with Klonopin "scared" her because they are "downers." *Id*. She took Xanax in the past but asked her doctor to stop them because they are addictive. R. 887-88. Because of her anxiety and panic attacks, which

---

[49] Although not clarified by the ALJ, it appears Ms. Cordero refers to her 23 year-old niece as her "daughter," since it is unlikely an 11-year old would do the bulk of the cooking or retrieve groceries purchased online.

can cause her heart to race, she leaves the house only when it is "mandatory," and someone must go with her. R. 889. Ms. Cordero described experiencing obsessive behavior such as repeatedly wiping a table when she is "hyper," but will often start something and forget to finish it. R. 890.

Ms. Cordero described memory problems that began before her mother passed away in 2002 and have gotten worse since that time. Her depression increased after her mother's death. R. 891. Her brother's suicide in January 2019 also increased her depression, as did the loss of a cousin in October 2018. R. 892. She has "weight issues," and described being a top weight of 232 pounds, getting down to 126 pounds on the day of the hearing. R. 893.

Ms. Cordero said that her daughter plays basketball at school, and although she had not yet had a game, Ms. Cordero would want to attend if she does have one. R. 895. (In his opinion, the ALJ misquoted Ms. Cordero as saying "she attends basketball games with her child," using this as a reason that Ms. Cordero is not as disabled as she claims to be. R. 831.) Although she briefly discussed her asthma and back problems, Ms. Cordero told the ALJ that her main issues were her epileptic seizures, her psychological limitations, and migraine headaches. R. 896.

Ms. Cordero's mother completed a Third Party Function Report while she lived with Ms. Cordero. R. 402-09. (Nelly Moina, Ms. Cordero's mother, died of cancer prior to the second hearing, one of several family stressers noted as a psychosocial factor). R. 1177, 1193. The ALJ recited the information contained in Ms. Cordero's mother's third-party function report, completed before her death on August 4, 2012, when she resided with Ms. Cordero. R. 837. He serially listed all of the adverse information contained in

that report. *Id*. Then he rejected the information contained in the report as warranting only "little weight." *Id*. The ALJ's reasoning was:

> The written statement was not given under oath. The author is also not a medical professional and a layperson, is not competent to make a diagnosis or argue the severity of the claimant's symptoms in relationship to the claimant's ability to work or the side effects of medications. Most importantly, the statement is not fully supported by the clinical or diagnostic medical evidence as previously discussed. The claimant's treatment records do not document such severe limitations and she has been noncompliant with treatment.

R. 837-38.

The description of the information contained in the third-party function report does not actually contain a "diagnosis," nor does it "argue the severity of claimant's symptoms," although it does describe Ms. Cordero's behavior as "down," and "argumentative." Ms. Moina said that her daughter could not sleep at night, and advised that Ms. Moina assisted in the care of Ms. Cordero's baby. She stated that her daughter "would forget that she was cooking," and could not drive due to anxiety attacks.[50] Ms. Moina would need to remind her daughter to change her clothes. Ms. Cordero could only "prepare simple meals such as cereal and sandwiches." Ms. Cordero could dust, sweep and wash dishes, but "her motivation was always down and depressed." Ms. Cordero "did not like to be around people and would only go out if she had an appointment. She did not socialize with others." Ms. Cordero "would become frustrated at times and was forgetful. She had difficulty handling stress due to her mood swings. She had a poor ability to handle changes. She also became very shaky and nervous around others."  R. 837.

---

[50] The report was written before Ms. Cordero lost her driver's license due to her uncontrolled epileptic seizures.

The ALJ concluded the third-party testimony was inconsistent with the record as a whole. He does not point to any particular inconsistency in the record. That does not permit meaningful review. My review of the record did not reveal any inconsistency, certainly not with the record as a whole. Once again, the ALJ includes a mention of Ms. Cordero's supposed noncompliance as a reason for rejecting her mother's testimony. This was error. Ms. Cordero was not "noncompliant" under the regulations.

### B. The ALJ Erred By Not Considering Whether Ms. Cordero's Epilepsy Was Severe at Step Two

Because I found the ALJ's reliance on Ms. Cordero's "noncompliance" with treatment to have been improperly used by the ALJ in rejecting the opinion of treating neurologist Dr. Lim, I requested supplemental briefing from the parties on the issue of whether or not an acceptance of Dr. Lim's opinion with regard to Ms. Cordero's epilepsy would have supported a finding of disability pursuant to § 11.02.

In response, Ms. Cordero argued that Dr. Lim's opinion verified that she suffered from generalized tonic-clonic seizures one to two times per month despite compliance with treatment. R. 1224-25. Doc. No. 24, p. 2. Because his treatment spanned a period from August 2014 to March 2019, and Ms. Cordero has never succeeded in stopping her seizures, she meets the requirements of § 11.02A, as she suffers from seizures one to two times per month for at least three months despite treatment. Therefore, she argues, a finding of disability is required pursuant to 20 C.F.R. § 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).

The Commissioner maintained in her supplemental briefing that the ALJ's finding that Ms. Cordero failed to comply with her treatment means that she does not meet Listing 11.02A or 11.02D because both listings require a finding that seizures

persist despite adherence to prescribed treatment. Doc. No. 25, pp. 2-3. The Commissioner recites several places in the record where there are indications that Ms. Cordero did not take one or more of her medications. *See, e.g*., R. 1540, 1784, 1792, 1795, 1845. While these citations are accurate, they do not change the fact that her treating physician has verified that, outside of these isolated documented events, his patient continues to suffer from one to three seizures per month, despite treatment. His opinion and records further document that her medications require frequent changes in dosage or substitutions, and he has yet to find a combination of medications that keep her from experiencing seizures. Because her treating doctor rendered his opinion with knowledge of instances in which Ms. Cordero did not achieve perfect compliance with her complex medication protocol, his opinion should not have been dismissed by the ALJ. The ALJ's focus on a few instances when Ms. Cordero did not take prescribed medication amounts to "cherry-picking,"[51] especially notable because the medical record is 2,000 or so pages long and years in the making. I will therefore decline to accept the Commissioner's position on this issue as my own.

At step two, the ALJ is required to consider the medical severity of any impairment. *See* 20 C.F.R. § 416.920(a)(4)(ii). Here, the ALJ's reason for rejecting Dr. Lim's medical records and opinion that document Ms. Cordero's intractable epilepsy are legally invalid, as the ALJ did not, and indeed could not, satisfy the requirements of SSR 82-59, concerning noncompliance. While the ALJ did cite to isolated incidents where Ms. Cordero advised medical personnel that she did not take her medication (or could

---

[51] "Cherry-picking" is a term used to describe selective citation of the record to support an opinion that is not supported by a fair and complete review of the entire record. *See Smith v. Berryhill*, No. 17-2661, 2018 WL 7048069, at *9 (E.D. Pa. Nov. 27, 2018) (Hey, MJ) (collecting cases). *See also Rosa v. Berryhill*, No. 16-5923, 2018 WL 1442893 (E.D. Pa. Jan. 31, 2018) (Lloret, MJ), *report and recommendation adopted*, No. 16-5923, 2018 WL 1426964 (E.D. Pa. Mar. 22, 2018) (Robreno, J).

not recall if she did), the ALJ did not have substantial evidence in the form of a physician's opinion, or records from a neurologist, that contradicted Dr. Lim's opinion with respect to her epilepsy. There is only one doctor in this record who treated Ms. Cordero for epilepsy, and he is the only doctor who offered an opinion with respect to that condition. Rejecting his opinion, when there was no other opinion in the record to contradict it, was error. The Third Circuit rejected such action on the part of the ALJ in *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988):

> Here three treating physicians, crediting Frankenfield's subjective complaints, which are consistent with the tests they conducted, determined that he is disabled. The Secretary cannot reject those medical determinations simply by having the administrative law judge make a different medical judgment. Rather, the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence. *Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir. 1979). The administrative law judge refers to no such evidence.

The Commissioner appears to suggest in her original responsive brief that the testimony of Dr. Cohen establishes substantial evidence that rebuts the opinion of Dr. Lim. *See* Com. Resp. at 4-5, arguing that the ALJ properly rejected the treating physicians' opinions by "permissibly grant[ing] more weight to the opinion of psychiatrist Luka W. Cohen, M.D., (sic)," and citing to no other contradictory evidence. But Cohen provided no testimony whatsoever concerning Ms. Cordero's epilepsy. His testimony was limited to the treatment of her bipolar and anxiety disorders, and the dubious conclusion that, based on his own research "from the 70's," her failure to properly take her medication was the sole reason that her "panic" disorder remained an issue.

"In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's

opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer,* 186 F.3d at 429; *Frankenfield v. Bowen,* 861 F.2d at 408; *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983)." *Morales*, 225 F.3d at 317–18 (3d Cir. 2000). The opinion of Dr. Lim with regard to Ms. Cordero's epilepsy should have been assigned controlling weight. Instead, the ALJ substituted his lay opinion for that of Ms. Cordero's treating physician, making speculative inferences on the basis of isolated records indicating Ms. Cordero may have missed doses of medication.  The ALJ substituted his own speculation for that of the treating physician. On this basis he failed to accept Ms. Cordero's epilepsy diagnosis at step two, finding that she did not meet Listing 11.04A. This was error.

The final determination of whether a claimant met or equaled a Listing is a decision reserved to the ALJ. *See* 20 C.F.R. §§ 404.1527, 416.927; *Schwartz v. Halter*, 134 F. Supp. 2d 640, 659 (E.D. Pa. 2001). Because this is ultimately the ALJ's decision, the ALJ does not have to accept a medical expert's opinion that the claimant equaled a Listing. *Schwartz*, 134 F. Supp. 2d at 659 ("The ALJ is therefore not required to accept the findings of agency medical or psychological consultant as to whether an individual's impairment is equivalent in severity to any listed impairment."). However, as with any other medical opinion evidence, the ALJ must consider the opinion and afford it proper weight. *Id.* ("[A] physician or psychologist designated by the Commissioner must give an opinion, based on the evidence, on the issue of equivalence; such opinion must be received into the record as expert opinion evidence; and the ALJ must give it appropriate weight."); *see also Cadillac v. Barnhart*, 84 Fed. App'x 163, 167–68 (3d Cir. 2003) (not precedential) (finding the ALJ's rejection of a reviewing medical expert's equivalency testimony to be insufficiently supported). Here, there is *no* contradictory

medical evidence supporting the ALJ's decision that Ms. Cordero does not suffer from one to two seizures per month despite treatment.

My analysis does not end there. Failing to find an impairment to be severe is a harmless error when the ALJ does not deny benefits at this stage and properly considers the condition in the remaining analysis. *See Rutherford v. Barnhart*, 399 F.3d 546, 552–53 (3d Cir. 2005) (failing to determine the severity of a condition at stage two was harmless because the ALJ properly considered it in the evaluation of the claimant's limitations); *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n.2 (not precedential) ("Because the ALJ found in [claimant's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citing *Rutherford*, 339 F.3d at 553)).

Had the ALJ properly considered the severity of Ms. Cordero's epilepsy in the latter stages of his analysis, the error might have been harmless, because Ms. Cordero was not denied benefits at step two and her epilepsy was considered in the remaining steps. *See Rutherford*, 339 F.3d at 552–53. The ALJ mentioned Ms. Cordero's epilepsy in partially rejecting the opinion of a consulting examiner who rendered an opinion that did not take her seizure disorder into account. R. 834 (opinion of Dr. Waldron). In determining Ms. Cordero's RFC prior to step four, however, the ALJ did not appear to consider Dr. Lim's opinion at all with respect to her uncontrolled seizures, as none of the limitations placed in the RFC relate to her seizure disorder, with the possible exception of noting that she is unable to drive. R. 832. This coincides with the ALJ consistently rejecting evidence of Ms. Cordero's uncontrolled epileptic seizures because she was "noncompliant" with her medications. Because this statement is both factually wrong, in that Dr. Lim, her treating neuorlogist, specifically stated that Ms. Cordero was

"compliant" with her medications, and wrong as a matter of law pursuant to the Administration's own regulations in conducting a noncompliance analysis, I do not find the ALJ's error at step two harmless.

### C.  The ALJ failed to address Ms. Cordero's ability to maintain a 40-hour work week.

In determining whether a claimant has residual functional capacity, the ALJ must weigh whether the claimant can engage in "sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (July 2, 1996). The Social Security Administration has defined a "regular and continuing basis" as comprising of work lasting "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id*. There was overwhelming evidence in this record that Ms. Cordero is unable to maintain such a schedule, yet the ALJ failed to conduct any sort of analysis as to why all of this evidence was rejected. Instead at Step 4, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> Specifically, as indicated by the above medical records, when she is complaint (sic) with treatment, her impairments are well controlled. She also cares for herself and her child. . . .

R. 833. What the ALJ fails to do anywhere in his decision is discuss how Ms. Cordero can engage in "sustained work activities in an ordinary work setting on a regular and

continuing basis," when virtually every one of her treating doctors have stated that her impairments would require her to miss work more than three days per month.[52]

During the hearing, the vocational expert ("VE") testified that based on his experience and knowledge, "absenteeism greater than one day per month would ultimately lead to no SGA." R. 905. Likewise, the VE testified that being "off-task" for 20% of an eight-hour workday would be work preclusive. *Id*. Yet, the ALJ never mentions this testimony in his decision, nor wrestles with how the two thousand pages of medical records and four specialists' opinions confirming that Ms. Cordero would miss three or more days per month as a result of each impairment, can be reconciled with the VE's testimony in order to support his finding that Ms. Cordero is capable of handling sedentary work. I find that the ALJ erred in failing to analyze whether Ms. Cordero could work a full-time job on a regular and continuing basis, in light of evidence of her several severe impairments.

### D. The Commissioner's Final Decision Is Reversed and This Matter Remanded with Direction to Award Benefits.

Because the ALJ committed reversible error at multiple places in his decision, the question remains whether I should award benefits or remand the case for further proceedings. As detailed above, the ALJ improperly rejected the opinion of Dr. Lim, which support a finding that Ms. Cordero's seizure disorder equaled Listing 11.02A. Likewise, the rejection of Drs. Siravaragapu's and Dr. Lirag's opinions with regard to the severity of Ms. Cordero's mental impairments also caused the ALJ to err in failing to

---

[52] Since different doctors have opined she would miss more than three days of work per month for different impairments, it is conceivable Ms. Cordero would miss six to nine days of work per month if she suffered her usual three epileptic seizures, two to three headaches, each of two to three days duration, and episodes of severe depression and anxiety, which may or may not relate to her bipolar episodes of mania and depression which affect her ability to sleep.

award benefits at steps four and five. The ALJ improperly relied on his own lay judgment and applied the wrong legal criteria when analyzing the evidence and the opinions of these board-certified physicians. Therefore, the decision was a product of harmful legal error, unsupported by substantial evidence, and should be reversed.

On the record as it stands now, there is substantial evidence that Ms. Cordero meets a Listing and is entitled to receive benefits. The Court of Appeals for the Third Circuit has instructed that "[t]he decision to direct the district court to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworney v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984); *see Morales,* 225 F.3d at 320. The record has been fully developed in this case, through two rounds of appeal. I have explained in some detail what the record reveals about Ms. Cordero's medical conditions. The question now is who shall bear the burden of the ALJ's legal errors. I conclude it should be the Commissioner, not Ms. Cordero.

Ms. Cordero has made out a *prima facie* case, by substantial evidence, that her combination of conditions equal at least Listing § 11.02A.[53] Where according to the Listings a claimant is disabled and entitled to benefits, courts, including our Court of Appeals, have directed the award of benefits rather than remanding for further proceedings. *See Allen v. Bowen*, 881 F.2d 37 (3d Cir. 1989); *see generally Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), *as amended* (April 9, 1996) (noting that claimant "meets or equals Listing § 12.04 and is entitled to a conclusive presumption of

---

[53] While I do not conclude that the opinions of the treating psychiatrists would possibly support a finding of disability pursuant to the psychiatric Listings 12.04 and 12.06, it is likely that a rigorous review of those findings, had they been properly weighed and accepted by the ALJ, would have supported such a finding.

disability. No purpose would be served by remanding for further proceedings."); *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989) ("'Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose.'" (quoting *Williams v. Bowen*, 844 F.2d 748, 760 (10th Cir. 1988)); *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 38 (D.D.C. 2013) (remarking on motion for reconsideration that "[g]iven the certainty in the record as to plaintiff's disability, the Court did not err in remanding solely for an award of benefits rather than for further administrative proceedings") (citing *Martin v. Apfel*, 118 F. Supp. 2d 9, 18 (D.D.C. 2000), which remanded for benefits where the ALJ's "ultimate conclusion that [plaintiff] was not disabled was not based on substantial evidence" but instead was "arrived at by irrationally disregarding highly probative evidence[.]").

The Court of Appeals has held that where there has been inordinate delay, coupled with an existing record that contains substantial evidence supporting a finding of disability, a reversal with direction to award benefits is appropriate, rather than a remand for further proceedings. *See Morales*, 225 F.3d at 320 (inexplicable delays not attributable to the claimant, a record that is unlikely to change, and substantial evidence that claimant suffers from a severe mental disability). The Court of Appeals had this to say, in a similar context:

> The Secretary, in effect, asks this court for a second chance to prove his case . . . . We see no reason, however, why the Secretary should be afforded such an additional opportunity. This is not a case where, for example, the legal standard was unclear . . . or the Secretary did not have an opportunity to consider a new policy . . . . The Secretary was given full opportunity to develop the administrative record in this case. . . . Where as here the claimant established a *prima facia* case of entitlement, the record was fully developed, and there is no good cause for the Secretary's failure to adduce all the relevant evidence in the prior proceeding, we see no reason to remand for further fact finding.

*Allen*, 881 F.2d at 44. A remand in this case would afford the Commissioner a third "chance to prove [her] case." *Id*. There are good reasons not to extend the Commissioner yet another bite at the apple. There is nothing to suggest that a remand would serve to fill in a substantial hole in the medical records. *See Morales*, 225 F.3d at 320 (record unlikely to change on remand).

Ms. Cordero filed her claim in 2012, nine years ago. She appealed the first unfavorable opinion, and the case was remanded by the district court because of the ALJ's failure to properly consider her doctors' opinions, as well as the subjective evidence. On remand, the second ALJ all but ignored the direction from the district court to consider the doctors' well-reasoned opinions, finding all of them flawed "given the record as a whole," when in fact the record supported those opinions.  Those opinions, in turn, in the case of Ms. Cordero's epliepsy, provided support for a finding of disability pursuant to Listing 11.02A.

Furthermore, the ALJ committed obvious error by repeatedly using Ms. Cordero's supposed "noncompliance" as a reason to deny benefits, while failing to conduct the analysis required by the Administration in order to rely on "noncompliance" as a reason to deny benefits. Nor did the record support a finding of "noncompliance." Quite the contrary, this record could never support such a finding. These were not harmless errors.

As in *Allen,* "[t]his is not a case where, for example, the legal standard was unclear . . . or the Secretary did not have an opportunity to consider a new policy[.]" *Allen*, 881 F.2d at 44. Rather, "[t]he Secretary was given full opportunity to develop the administrative record in this case[.]" *Id.* Despite this opportunity, "[t]he ALJ . . . avoided

a decision in [the claimant's] favor only by effectively bypassing the issue concerning the effects of the mental impairment." *Woody v. Sec'y of Health & Human Servs.*, 859 F.2d 1156, 1162-63 (3d Cir. 1988).

Despite the opportunity proffered by the district court's remand in 2016, the Commissioner has simply committed new (but still obvious) errors, the effect of which was (again) to avoid the probative value of the medical evidence provided by *four* treating physicians, who all agreed that Ms. Cordero suffers from debilitating conditions which make it impossible for her to handle full-time employment. As in *Allen*, I "see no reason to remand for further fact finding." *Allen*, 881 F.2d at 44.  I "conclude that this is an appropriate case for the exercise of [the] prerogative to direct an award of benefits." *Woody*, 859 F.2d at 1163.

I reverse and direct an award of benefits.

## VI.   <u>CONCLUSION</u>

Based upon the above, Plaintiff Lorraine Cordero's Request for Review is granted. I find that the ALJ committed harmful error in disregarding opinions from Drs. Lim, Siragavarapu, Lirag, and Malik, and substituting his own lay opinion to direct a denial of benefits. The ALJ improperly used "noncompliance" as a reason to reject all four opinions. The error resulted in the ALJ's failure to find that Ms. Cordero is disabled pursuant to a Listing, specifically § 11.02A, relating to epilepsy, and failure to find that Ms. Cordero is disabled as a result of a combination of her severe mental impairments of bipolar disorder, depression and anxiety disorder. Ms. Cordero should have been granted benefits given her severe seizure and psychological impairments documented in her medical records and confirmed through the opinions of her treating neurologist and both of her treating psychiatrists. The Commissioner's final decision is reversed and this

matter remanded for the calculation and payment of benefits within sixty (60) days of this opinion and order.

BY THE COURT:


  *s/ Richard A. Lloret*
RICHARD A. LLORET
U.S. Magistrate Judge